429 Pa. Superior Ct. 304 (1993)
632 A.2d 577
In re C.E.H., D.B.P., K.L.P.
Appeal of MARY ANN H.
In re D.B.P., K.L.P.
Appeal of BARRY P., Natural Father.
Superior Court of Pennsylvania.
Submitted August 23, 1993.
Filed October 22, 1993.
*305 Jay Stillman, Asst. Public Defender, Williamsport, for Mary Ann H., appellant.
James R. Protasio, Williamsport, for Barry P., appellant.
Ralph W. Thorne, Williamsport, for appellee.
*306 Charles F. Greevy, III, Williamsport, for Lycoming County Children & Youth Services, participating party.
Before OLSZEWSKI, POPOVICH and HESTER, JJ.
POPOVICH, Judge:
This is an appeal from a decree entered in the Orphans' Division of the Court of Common Pleas of Lycoming County terminating the parental rights of Mary H., the natural mother, and Barry P., the natural father. We affirm.
Mary H. and Michael Boutwell are the natural parents of Chad H. Appellants, Mary H. and Barry P., are the natural parents of Damien P. and Kassandra P. On February 3, 4, and 5, 1992, hearings were held on the petitions filed by Children and Youth Services (hereinafter "CYS") to terminate involuntarily appellants' parental rights with respect to Chad H., Damien P., and Kassandra P.[1] Following the hearings, the trial court ruled that CYS had established by clear and convincing evidence the grounds for involuntary termination of parental rights set forth in 23 Pa.C.S.A. § 2511(a)(2) and (a)(5).[2] The trial court entered a decree nisi terminating the *307 parental rights of Mary H. and Barry P. On December 4, 1992, the trial court dismissed appellants' exceptions to each decree nisi. The trial court entered a final decree terminating appellants' parental rights. Thereafter, Mary H. and Barry P. each filed a timely appeal from the final decree.
In reviewing an involuntary termination of parental rights, we must review the record to determine whether the Orphans' Court decree is supported by competent evidence. In re Matsock, 416 Pa.Super. 520, 611 A.2d 737, 742 (1992). We will not reverse the decision of the Orphans' Court to terminate parental rights absent an abuse of discretion, an error of law, or insufficient evidentiary support for the findings of the Orphans' Court. In re Shives, 363 Pa.Super. 225, 228-229, 525 A.2d 801, 802 (1987). "An abuse of discretion is `not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused.'" In re Matsock, 611 A.2d at 742, quoting, Mielcuszny et ux. v. Rosol, 317 Pa. 91, 93, 176 A. 236, 237 (1934).
The record reveals CYS's history with Mary H. and Barry P. On December 11, 1985, Mary H. gave birth to Chad H. At that time, Mary H. was residing with her maternal grandmother. Mary H.'s grandmother provided the primary care for Chad H. In April of 1986, Mary H. moved in with a friend, Janet Yoder. Ms. Yoder cared for Chad H. while Mary H. resided in her home. On April 29, 1986, Mary H. voluntarily contacted CYS, and CYS provided protective supervision, a parent-partner and ongoing PACT[3] Program participation.
Mary H. and Chad H. then moved in with Mary H.'s brother and his wife. The parent-partner, Dixie Halderman, *308 worked with Mary H. and Chad H. while they resided with George H. and Linda H. Linda H. provided the primary care for Chad H. during this period.
Mary H. began a relationship with Barry P. in May of 1986. On July 15, 1986, Mary H. signed an agreement giving primary physical and legal custody to George H. and Linda H. Chad H. remained with George H. and Linda H. until March 4, 1987, when he was returned to Mary H., who was then living with Barry P.
The parent-partner, Dixie Halderman, continued to work with Mary H. and Chad H. Ms. Halderman testified that Mary H. was indifferent to Chad H. and was rough when handling him. N.T., February 3, 1992, at 71, 75. Ms. Halderman testified further that Mary H. became angry and frustrated easily when working with CYS and the PACT participants. Id. at 77. CYS recommended that Mary H. and Barry P. receive counseling because Mary H. and Barry P. had physical confrontations. Mary H. and Barry P. made little effort to work on these problems.
On August 15, 1988, Damien P. was born, and thereafter, Mary H. refused to accept CYS's services on a voluntary basis. On September 4, 1988, CYS closed their involvement with Mary H. and her family. In November of 1988, Damien P. was hospitalized for failure to thrive, and in December of 1988, custody of Damien P. was placed with CYS. Although Chad H. and Damien P. were both adjudicated dependent, Chad H. remained with his mother, while Damien P. was placed in foster care.
On March 29, 1989, a disposition review hearing was held, and the court ruled that Mary H. and Barry P. had failed to meet the goals set by CYS concerning the medical care and home environment for Chad H. The court ordered that Damien P. should remain in foster care and Chad H. could remain at home with Mary H. and Barry P. On September 1, 1989, Chad H. was placed in a foster home pursuant to an emergency court order because the condition of the home of Mary H. and Barry P. was deplorable. Following a review *309 hearing on November 8, 1989, CYS recommended long term placement in foster care.
In December of 1989, Mary H. and Barry P. made progress on correcting the problems in their home, and Chad H. was returned to Mary H. on December 21, 1989. From December of 1989 until April of 1990, Mary H. and Barry P. completed goals set by CYS, and on April 11, 1990, Damien P. was returned to his parents.
On May 1, 1990, Kassandra P. was born, and both mother and daughter were healthy at that time. Parent-partner, Fran Stiber, worked with the family and noted progress made by the parents following the birth of Kassandra P. On July 16, 1990, Mary H. reported to the parent-partner that Kassandra P. had a black right eye. Kassandra P. was taken to a hospital and it was determined that she had suffered a bilateral skull fracture, and subdural hematoma which had occurred two to five days prior to admission of Kassandra P. to the hospital. Mary H. gave various explanations for the injuries suffered by Kassandra P. Mary H. finally admitted that she picked up the baby by the head, squeezed her and shook her until Kassandra P. slipped out of Mary H.'s hands. Kassandra P. then hit a stand and fell to the floor. The incident occurred two days before Mary H. reported it to the parent-partner. On January 23, 1992, Mary H. pleaded guilty to recklessly endangering and causing aggravated assault to her child. Barry P. pleaded "no contest" to charges of endangering the welfare of a child in relation to the injuries suffered by Kassandra P.
As a result of Mary H.'s abuse of Kassandra P., all three children were placed in the emergency custody of CYS on July 17, 1990. Thereafter, CYS filed a petition seeking the termination of the parental rights of Mary H. and Barry P.
Appellants' sole argument on appeal is that the evidence was insufficient to establish that the conditions which led to the placement of the children would not or could not be remedied within a reasonable period of time with the provision of reasonably available services. Appellants contend that the *310 progress made in the six month period prior to the removal of the children shows that the conditions which led to the placement of the children could be remedied. Additionally, appellants argue that the agency made only a "token" effort to help Mary H. and Barry P. to correct the conditions which led to the placement of the children.
The record shows that appellants had a long history of problems caring for their children. Despite the services offered by CYS, Mary H. and Barry P. were unable to provide their children with adequate care or maintain a clean and healthy environment for their children. Although appellants made progress during a period in 1990, the children were home for only three months when the severe physical abuse of one child led to the emergency removal of all the children.
Ann O'Brian, a caseworker for CYS, testified about the basis for CYS seeking termination of Mary H.'s and Barry P.'s parental rights. N.T., February 5, 1992, at 187. The first factor that CYS considered was the serious injury to Kassandra P. Id. Secondly, Damien P. had lived all but six months of his life in foster care, and CYS recommends that when a child has been in foster care for more than a year, it should be determined whether the child's parents will be able to fulfill their parental obligations to the child. Id. at 187-188. Finally, Ms. O'Brian testified that Mary H. was unable to care for any of her children when they were infants. She further noted that "with each subsequent child the abuse became more severe, more profound, and more life threatening, and based on those factors [CYS] recommended that termination be sought." Id. at 188.
Following the placement of the three children, a caseworker and a parent-partner visited Mary H. and Barry P. at their home. N.T., February 5, 1992, at 180. Fran Stiber, the parent-partner testified that Mary H. and Barry P. were too busy to work with her on their home environment. N.T., February 3, 1992, at 104. Additionally, Mary H. and Barry P. had supervised visits with their children at CYS. Id. Ann O'Brian testified that she supervised these visits and based on her observations she did not believe that Mary H. would be *311 able to care for her children on a full time basis. N.T., February 5, 1992, at 190. After charges were filed against Mary H. and Barry P. for causing Kassandra P.'s injury, Mary H. and Barry P. were not allowed to have any contact with Kassandra P. Id. at 185. Barry P. was also convicted of sexually abusing his niece and was ordered to have no contact with any minor children. N.T., February 5, 1992, at 193.
After reviewing the testimony, we disagree with appellants allegation that CYS made only a "token" effort to help Mary H. and Barry P. correct the conditions that led to the placement of their children. CYS continued to offer services to Mary H. and Barry P. However, Mary H. and Barry P. failed to work with the case-worker and the parent-partner in improving the environment of their home. Mary H. and Barry P. also had problems interacting with the children during visits. N.T., February 3, 1992, at 104-112; N.T., February 5, 1992, at 181, 183-84, 190. CYS attempted to help Mary H. and Barry P. with their family over the course of several years but Mary H. and Barry P. were unable to provide a healthy environment for their children and did not properly care for the children. Therefore, we will not disturb the ruling of trial court.
Final decree affirmed.
OLSZEWSKI, J., files a concurring opinion.
OLSZEWSKI, Judge, concurring:
I wholeheartedly agree with my colleagues that appellants' parental rights have been properly terminated in this case. I write separately to note that not only is our decision well supported by the facts of this case, but also by a considerable body of social scientific evidence. See David J. Herring, Inclusion of the Reasonable Efforts Requirement in Termination of Parental Rights Statutes: Punishing the Child for the Failures of the State Child Welfare System, 54 U.Pitt.L.Rev. 139 (1992).
Professor Herring's article urges agencies such as Children and Youth Services to make efforts to support and rehabilitate *312 parents early on in child welfare cases. All too often, however, children are trapped in long-term foster care while child welfare agencies engage in futile attempts to improve the familial environment. This delay in terminating parental rights and finding a nurturing, stable, permanent placement for the child tends to stunt the child's emotional and psychological development. The longer the delay, the greater the harm. Professor Herring therefore argues that requiring child welfare agencies to engage in rehabilitative efforts as a condition precedent to terminating parental rights only punishes the child for failures of the child welfare system.
In the present case, the system has by no means failed appellants; CYS has already made commendable efforts to work with appellants and improve their parenting skills. The inefficacy of these efforts supports the termination of appellants' parental rights. But our primary concern should be the best interests of the child. In deciding whether CYS has made reasonable efforts, we must consider not only the parents' amenity to rehabilitation, but also the children's developmental needs. Chad, Damien and Kassandra's need for a stable, nurturing environment also militates in favor of a prompt termination of parental rights.
NOTES
[1] Michael Boutwell has not appealed the decree terminating his parental rights with respect to Chad H. Mary H. and Barry P. each appealed the decrees terminating their parental rights. These appeals have been consolidated for our review.
[2] Sections 2511(a)(2) and (a)(5) provide the following:

(a) General rule.  The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
.....
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
.....
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continued to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
[3] PACT stands for Parents and Children Together. N.T., February 3, 1992, at 67.