**In re: A.R., A Minor.**

**Appeal of: V.R., Natural Mother, Appellant.**

**In re: L.R., A Minor.**

**Appeal of: V.R., Natural Mother, Appellant.**

**In re: V.R.**

**Appeal of: V.R., Mother, Appellant.**

**In re: S.R.,**

**Appeal of: V.R., Mother, Appellant.**

**In re: A.R., A Minor.**

**Appeal of: G.R., Natural Father, Appellant.**

**In re: L.R., A Minor.**

**Appeal of: G.R., Natural Father, Appellant.**

**In re: V.R., A Minor.**

**Appeal of: G.R., Natural Father, Appellant.**

**In re: S.R.,**

**Appeal of: G.R., Natural Father, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 18, 2003.

Filed Nov. 25, 2003.

Gregory A. Stuck, Northumberland, for V.R., natural mother.

Richard R. Feudale, Mt. Carmel, for G.R., natural father.

Paige Rosini, Shamokin, Guardian Ad Litem.

Michael J. Robinson, Sunbury, for Northumberland CYS.

BEFORE: FORD ELLIOTT, BOWES, and TAMILIA, JJ.

OPINION BY FORD ELLIOTT, J.:

¶ 1 This case concerns the involuntary termination of parental rights of V.R. ("Mother") and G.R. ("Father") to their minor children, A.R., S.R., L.R., and V.R. Appellants Mother and Father have filed separate appeals from the November 8, 2002 orders entered in the Court of Common Pleas of Northumberland County that terminated their parental rights to each of their four children. We have consolidated the appeals for ease of discussion.

¶ 2 Northumberland County Children and Youth Services ("CYS") first became involved with Mother and Father and their children in February of 1995. At that time, CYS received a referral that there was a lot of yelling and cursing at the children and the children were dressed inappropriately. (Notes of testimony, 10/31/02 at 5.) As a result, numerous pre-placement services were provided to the family by several agencies. Services were provided by: The Parent Center in 1996; Head Start for S.R. and L.R.; early intervention for V.R.; Women, Infant and Children; drug and alcohol program in January 1996; CYS provided diapers; Northumberland County Housing and Urban Development; Department of Public Welfare provided financial/medical assistance; summer day camp; the Salvation Army provided school clothes and food in 1996; Christmas program was provided in 1996; Catholic Charities provided food in 1996; the Red Cross provided food in 1996; juvenile court services were provided in 1999; Haven Ministries provided food in 2000; and Helping Hands provided food in 2000. (*Id.* at 6–7.)

¶ 3 On March 12, 2001, CYS placed the children into foster care for issues pertaining to housing. The trial court has summarized the circumstances of each of the children as follows:

A.R., age fourteen (14) years, has been outside of the custody of her parents for a total of one hundred twenty-six (126) months, or approximately two-thirds of her life. In July 1988, she was placed in foster care in Akron, Ohio and remained there until September 1989. She then lived with her paternal grandmother and later a paternal aunt until 1997. Thereafter, A.R. lived with her parents until March 12, 2001, at which time she was again placed in foster care, this time in Northumberland County. She remained in this care until her re-

turn to her parents on May 21, 2001. A month later, on June 22, 2001, A.R. was returned to foster care where she has remained.

S.R., age twelve (12) years, and L.R., age nine (9) years, have been outside the custody of their parents for a total of eighteen (18) months. On April 15, 1993, they were placed in foster care in Akron, Ohio where S.R. remained for two (2) days and L.R. remained for five (5) days. On March 12, 2001, they were again placed in foster care, this time in Northumberland County, where they have remained with the exception of a month as noted above as to their sister.

V.R., age seven (7) years, has been outside the custody of her parents for a total of eighteen (18) months. As with her siblings, on March 12, 2001, she was placed in foster care in Northumberland County where she has remained but for a month.

All four children were returned to foster care in Northumberland County on June 22, 2001 due to inadequate housing. At that time, a General Protective Services referral indicated the family was being evicted from their home. This continued a seven-year trend of transience. During that period, the parents relocated five (5) times. In July of 2002, they again changed residence to the house in which they are now located. At the time of hearing on this matter, however, the house was still unfit for the children's residence as [the parents] were supposedly in the process of preparing the house for habitation. It is the finding of this Court that the conditions leading to the June 22, 2001 placement of the children in foster care continue to exist more than twelve (12) months after such placement.

Trial court opinion, 1/9/03 at 2–3.

¶ 4 In August of 2002, CYS filed petitions to terminate Mother and Father's parental rights, and a hearing was held on October 31, 2002. On November 8, 2002, the trial court entered orders terminating the parental rights of Mother and Father to A.R., S.R., L.R., and V.R. It is from these orders that Mother and Father appeal.

¶ 5 When reviewing a decree that involuntarily terminates parental rights, this court's scope of review is limited to determining whether the trial court's decision is supported by competent evidence. *In re Bowman,* 436 Pa.Super. 10, 647 A.2d 217, 219 (1994), *affirmed,* 542 Pa. 268, 666 A.2d 274 (1995). Absent an abuse of discretion, error of law, or insufficient evidentiary support for the findings of the trial court, the decree must stand. *In re C.E.H.,* 429 Pa.Super. 304, 632 A.2d 577, 579 (1993).

¶ 6 The termination of parental rights is governed by statute. *In re Child M.,* 452 Pa.Super. 230, 681 A.2d 793, 797 (1996), *appeal denied,* 546 Pa. 674, 686 A.2d 1307 (1996). Before permitting termination, the trial court must be satisfied that the petitioner has established the required statutory elements by clear and convincing evidence. *In the Interest of Q.J.R.,* 444 Pa.Super. 460, 664 A.2d 164, 165 (1995), *appeal denied,* 544 Pa. 612, 674 A.2d 1074 (1996). Clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing that the trier-of-fact may come to a clear conclusion, without hesitance, of the truth of the precise facts in issue. *In re Adoption of Dale A., II,* 453 Pa.Super. 106, 683 A.2d 297, 299 (1996). Finally, "[p]ursuant to the express mandate of Section 2511(b), a court must give 'primary consideration to the needs and welfare of the child.'" *In the Matter of Adoption of Charles E.D.M., II,* 550 Pa. 595, 602, 708 A.2d 88, 92 (1998).

¶ 7 As Mother and Father raise the same issues on appeal, we will address

them together. First, Mother and Father argue that CYS failed to prove that they, the parents, evinced a settled purpose to relinquish their parental claim and/or failed to perform their parental duties. We point out that this argument concerns 23 Pa.C.S.A. § 2511(a)(1). The trial court granted CYS' petitions based on 23 Pa. C.S.A. § 2511(a)(8). Therefore, we have no need to address this argument.

¶ 8 Next, Mother and Father argue that CYS failed to prove the grounds for termination under Section 2511(a)(8). Section 2511(a)(8) provides as follows:

(a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

(b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

¶ 9 As noted above, Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court. In the present case, all four children have been out of their parents' care for over 12 months. The trial court must next determine whether the conditions that led to the children's removal continue to exist. "[I]f a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time, [CYS] has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." *In the Interest of Lilley,* 719 A.2d 327, 332 (Pa.Super.1998).

¶ 10 Carla Clark, a caseworker from CYS, testified concerning post-placement services offered to Mother and Father. On November 9, 2001, the parents were ordered to attend the Parent Center. (Notes of testimony, 10/31/02 at 9.) As of October 31, 2002, Mother had attended a total of seven times and Father six times. (*Id.* at 10.) The November 9th order required the parents to provide a safe and stable home environment for the children; required Mother to attend anger management classes; and directed the parents to obtain steady employment. (*Id.* at 9, 13, 14) The November 9th order also permitted bi-weekly visitation which the parents took advantage of by attending 24 of 27 scheduled visits. (*Id.* at 14.)

¶ 11 Pam Waite, who had been the family's assigned caseworker since December 2001, testified that Mother and Father told her on several occasions that they did not attend the Parent Center because they were working on their house.[1] (*Id.* at 26,

---

1. Mother and Father did not own the house.    Instead of paying rent, they were performing

28.) Ms. Waite testified that as of October 31, 2002, she was still waiting for Mother and Father to inform her that the house was completed so she could inspect it to determine whether it was safe and appropriate for the children. (*Id.* at 30.)

¶ 12 Ms. Waite testified that Mother had not attended the anger management classes. (*Id.* at 36.) According to Ms. Waite, Mother could not attend the anger management classes because she worked part-time at a Burger King restaurant, she had repair work to perform on the house, and she had to attend sessions at the Parent Center. (*Id.* at 36, 77.) Ms. Waite testified Father did not work, and she believed he was on disability. (*Id.* at 37.)

¶ 13 Father admitted he was aware that he was required to obtain safe, stable, and appropriate housing for the children. (*Id.* at 72.) Mother testified that she and her husband had been working on the house for the last four months to make it habitable, and she estimated that it would take another two months to finish. (*Id.* at 84–85.) Mother was asked what else needed to be done. She stated, "Insulation needs to be put in the walls in the one back bedroom. And then you have to put the walls and stuff back up and put the electrical stuff in." (*Id.*)

¶ 14 This court stated in *In re Adoption of A.N.D.*, 360 Pa.Super. 157, 520 A.2d 31, 37 (1986), *appeal denied*, 516 Pa. 638, 533 A.2d 710 (1987), "[a] child needs a stable home and a stable family relationship." Instantly, the trial court determined that unsafe environmental conditions continued to exist in the home for the children. Additionally, the parents have not participated in the classes they were ordered to attend; hence, the court was well aware that parenting and emotional (anger management) issues continued to exist. Considering the record as a whole, we conclude the deficiencies that exist will not be remedied any time soon.

¶ 15 Finally, we recognize, as did the trial court, that no termination can occur unless it serves the needs and welfare of the children. Section 2511(b) centers judicial inquiry upon the welfare of the child rather than the fault of the parent. *In re Angry*, 361 Pa.Super. 180, 522 A.2d 73, 75 (1987). Mother suggests her parental bond with the children is strong and evident by her testimony "I love my kids to death." (Notes of testimony, 10/31/02 at 77.) Father's argument centers on whether the two older children should have been asked their preference concerning adoption. However, as Father is well aware, this is not a custody matter where older children are given the opportunity to express their preferences. The state, as *parens patriae*, has a duty to care for its more dependent citizens, especially young people who are without the requisite parental supervision. *In the Interest of Green*, 273 Pa.Super. 397, 417 A.2d 708, 711 (1980). In proceedings such as these, the children do not decide what is best for them.

¶ 16 The trial court analyzed the needs and welfare of these children as follows:

For the most part, the children are doing better since being placed in foster care. Although S.R. continues to experience emotional issues, for which he is receiving treatment, the other children appear to be thriving. Since parental visitations have ceased, A.R.'s schoolwork has improved and she appears to have a close relationship with her foster parents. L.R.'s and V.R.'s behaviors have improved since this visitation was ended. These girls have been doing 'very well' in school since their place-

the work needed to repair the house. (Notes of testimony, 10/31/02 at 59, 82.)

ment and they have both expressed an interest in being adopted by their foster parents.

. . . .

The children do not share a strong bond with their natural parents. A.R. does not ask to see her parents and she, in fact, shows anger toward her mother. She is closer to her father, but she had not spoken about him in the month prior to the hearing. S.R. has indicated indifference as to whether he has contact with his parents. None of these children has acknowledged missing the natural parents. There is little interaction by the parents with the two younger girls at visits. At these visits, the father only pays attention to A.R., while the mother interacts only with S.R.

Together, these factors indicate termination of parental rights is in the best interest of the children. There were unchallenged allegations of emotional abuse, which CYS found to be indicated. The children, for the most part, are doing much better since they have been in foster care. Their grades, attitudes and behaviors have improved following placement. Further, Appellants show little interest in becoming better parents. Finally, the children have not expressed any desire to reunite with the natural parents. '[W]here preserving family unity in form when no parent-child relationship exists will in fact cast the child into an unstable and unhappy environment, a consideration of the child's needs and welfare may warrant termination.' *In re P.A.B.*, 391 Pa.Super. 79, 570 A.2d 522, 525 (1990). It is therefore the finding of this Court that the termination of parental rights is in the best interest of the children.

Trial court opinion, 1/9/03 at 4–5.

¶ 17 Based on our review of the entire record, we do not believe the trial court

erred in finding that CYS has met its burden proving the statutory elements contained in Section 2511(a)(8). Additionally, we find the record provides competent evidence that the needs and welfare of the children are best served by the termination of Mother and Father's parental rights.

¶ 18 Orders affirmed.

