J-A10003-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.C.T. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: R.T. AND C.N. | : | No. 1792 MDA 2014 |

Appeal from the Order Entered September 24, 2014
In the Court of Common Pleas of Centre County
Orphans' Court at No(s): 2014-3972

BEFORE:  GANTMAN, P. J., MUNDY, J., AND JENKINS, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED APRIL 09, 2015**

Appellants, R.T. ("Father") and C.N. ("Mother") (collectively, "Parents"), appeal from the order entered in the Centre County Court of Common Pleas, Orphans' Court, which granted the petition of the Centre County Children and Youth Services ("CYS") for involuntary termination of Parents' parental rights to their minor child, M.C.T. ("Child"), who was born in July 2009.  We affirm.

In its Opinion and Order granting involuntary termination of Parents' parental rights (dated September 23, 2014, and filed September 24, 2014) the trial court fully and correctly set forth the relevant facts of this case.[1] Therefore, we have no reason to restate them.

---

[1] On page two of the court's September 2014 Opinion and Order, the court mentions two referrals CYS received regarding Child's well-being in July 2012 and August 2012.  The court mentions that in July 2012, CYS received a referral about a naked boy (Child) wandering alone on 3rd Street.  The court also mentions that in August 2012, CYS received another referral

Parents raise the following issue for our review:

> WERE THE TRIAL COURT'S DETERMINATIONS SUPPORTED
> BY CLEAR AND CONVINCING EVIDENCE?

(Parents' Brief at 4).

The standard and scope of review applicable in termination of parental rights cases are as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
>
> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

---

regarding Child wandering alone on the street, after which Trooper Haponski returned Child to Parents. At the termination of parental rights hearing, Trooper Haponski testified that on August 13, 2012, he received a radio dispatch about a naked child walking around the streets alone. The trooper learned this boy was Child and ultimately returned Child to Parents. Further testimony from one of the CYS caseworkers also mentioned an earlier referral regarding Child's welfare in July 2012, but the caseworker did not describe the basis for that referral. In any event, it appears the court might have inadvertently overlapped the content of these two referrals.

On page three of the court's September 2014 Opinion and Order at ¶10, the court states CYS filed a dependency petition on August 28, 2014; the correct date for the dependency petition was August 28, 2012.

> The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We may uphold a termination decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result.

*In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super. 2007), *appeal denied*, 597 Pa. 718, 951 A.2d 1165 (2008) (internal citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the comprehensive opinion of the Honorable Thomas King Kistler, we conclude Parents' issue merits no relief. The trial court opinions discuss and properly disposed of the question presented. (*See* Trial Court Opinion, filed October 27, 2014, at 1; Opinion and Order, filed September 24, 2014, at 6-10) (finding: ample evidence presented at termination hearing demonstrated that dangerous conditions existed in Parents' home, and removal of Child from Parents' home was necessary for Child's welfare; following Child's removal from Parents' home, Parents were very uncooperative with CYS; Parents refused to allow CYS caseworkers access to home on numerous occasions; Mother became extremely hostile toward CYS after incident in which CYS caseworker requested to be present when Mother gave urine sample for detection of drugs, to ensure Mother did not falsify her sample; Mother was outraged at CYS' request and remained openly antagonistic to CYS thereafter, which deterred CYS' ongoing efforts to

- 3 -

restore Child's family to level of functioning that would enable return of Child to Parents; CYS' request was not form of "indignity" designed to embarrass or harass Mother but was merely routine verification process; Child has made dramatic improvements while living with initial foster family and current foster family; Child has progressed from speaking no more than four words[2] and having abject fear of water and bathing, to well-developed and prospering child; individuals most familiar with Child's care and treatment testified about Child's remarkable and outstanding progress while in foster care; notwithstanding Child's show of familiarity and affection to Parents during visits, termination of Parents' parental rights under circumstances of this case was in Child's best interests; CYS met its burden for involuntary termination of Parents' parental rights under Section 2511(a)(2), (a)(5), (a)(8), and (b)).[3] Accordingly, we affirm on the basis of the trial court's opinions.

Order affirmed.

---

[2] Child's initial foster mother testified that Child could say only the words "num-num," "gun," "kill," and "movie," upon Child's placement.

[3] On page seven of the court's Opinion and Order, the court cites *In re Adoption of C.L.G.* The correct citation for the quoted portion of this case is: 956 A.2d 999, 1009-10 (Pa.Super. 2008) (*en banc*). Additionally, on the following page of the court's Opinion and Order, the correct citation for *In re V.E. and J.E.* is: 611 A.2d 1267 (Pa.Super. 1992).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/2015

IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE INVOLUNTARY TERMINATION :
OF PARENTAL RIGHTS TO : No. 3972
_ ᴍ · ᴄ · ᴛ · :

**OPINION IN RESPONSE TO MATTERS COMPLAINED OF ON APPEAL**

**KISTLER, J.**

Appellants, ᴿ·ᵀ· and ᴄ·ɴ· , parents to the above-named child, filed an

appeal on October 22, 2014 of this Court's Opinion and Order of September 24, 2014

contemporaneously with a Statement of Matters Complained of on Appeal pursuant to

Pennsylvania Rule of Appellate Procedure 1925(b). Appellants raise one matter complained of

on appeal, that the termination of parental rights was not supported by clear and convincing

evidence. Appellants have also raised any properly preserved issues that may appear upon

examination of the notes of testimony. Upon review of Appellants' Statement, the Court

respectfully submits, pursuant to Pa.R.A.P. 1925(a), that this Court's Opinion and Order of

September 24, 2014 was correctly entered, the reasons for which were adequately addressed

therein. Therefore, the Court relies on its previous Opinion and Order and respectfully submits

that no further opinion is necessary at this time. The Court hopes this Opinion aids the Honorable

Superior Court in this matter.

BY THE COURT:

Date: October 24, 2014

Thomas King Kistler, Judge

☐O ☐RD ☒S

IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN THE INTEREST OF:                )
                                   )        NO. 3972
M.C.T.                             )

## OPINION AND ORDER

**KISTLER, J.**

AND NOW, this 23rd day of September, 2014, after hearing on August 15, 2014, and after submission of Suggested Findings of Fact and Conclusions of Law by Centre County Children and Youth Services, the Guardian *ad litem*, and the parents, the Court hereby adopts in almost complete and identical form, the Proposed Findings of Fact as set forth by the Guardian *ad litem*. The objectivity and the balance of the Guardian *ad litem's* observations, together with his inherent interest in the best interests of the child, provide the Court with great comfort and assurance incorporating those Findings of Fact after review of the Findings of Fact of all parties:

### PROPOSED FINDINGS OF FACT

1.     Centre County Children and Youth (CYS) has had intermittent contact with the family of M.C.T. (" child") , since 2005 due to concerns surrounding home conditions, as well as lack of supervision of the children.

2.     Child's parents, R.T. (father) + C.N. (mother) (parents) have had a long history of being uncooperative with CYS and have refused to take advantage of the services offered to them by the agency.

☐O ☐RD ☒S                          (1)



3.      In January, 2012, CYS received yet another referral regarding the family of Chi\d for deplorable home conditions, lack of running water and heat in the home, as well as lack of adequate food for Child and his two sisters (Ja-T and I.T. who are not subject to this proceeding).

4.      Because the parents refused to allow access into the home, CYS had to obtain a court Order on January 5, 2012 to assure the safety of child and his siblings in the home.

5.      As a result of this contact with CYS, child and his siblings ended up in the home of P.T. and J.T. ; their paternal uncle and aunt in Clinton County, during which time the parents visited them sporadically.

6.      On February 14, 2012, Child and his siblings were returned to their parents, at which time, CYS provided them with protective services with the goals of: maintaining a clean and healthy and safe home environment for the children, making sure that the children are all clean and maintaining regular doctor appointment for Child who was reported to have known to have high levels of lead in his blood.

7.      A little more than 5 month later, CYS received a referral regarding a naked male child alone on 3rd St. in Phillipsburg, who then, went onto the porch of his parent's home ( Father and Mother ), entered the house, and when the source of referral knocked on the door no one answered.

8.      Less than a month later, CYS received yet another referral regarding Child wondering alone in the streets of Philipsburg where he was found by a Philipsburg State Trooper (Trooper Haponski). After being identified as the child of Father + Mother by a family friend, Trooper Haponski took Child to the home of his parents who knocked on the door, where

(2)

he could hear noises coming from inside the house. After a long while, child's father (R.T.) finally opened the door and said to child "you really did it this time, kid".

9. During this interaction with CYS, the agency found the residence to be in even more deplorable conditions than their previous encounter. CYS found the home to be filthy, with cat urine and dog feces scattered all over the floors, carpets, bedrooms and all throughout the house. CYS also discovered that there was almost no food in the house for child and his siblings to eat.

10. As a result of continued lack of cooperation, and the parents' steadfast refusal to allow access to their home, on August 28, 2014, CYS filed a petition seeking dependency of child and his sisters.

11. On September 7, 2012, after continuing the case once, child and his sisters were declared dependent by this Honorable Court, at which time, parents were Ordered to cooperate with CYS. After being declared dependent by the court, the Court maintained physical custody of all 3 children with their parents conditioned upon their compliance with their court-ordered conditions.

12. In October of 2012, CYS received, yet, another referral that child's sisters showed up at school dirty and smelling like animal discharge. Parents, once again refused services from Parenting Plus, as well as not allowing CYS access to the house for additional inspection, and even slammed the door shut on Tasha Rishel, CYS's protective case worker at the time.

13. On October 30, 2012, children were finally removed from home due to their parents continued non-compliance , lack of cooperation with CYS, continued filthy conditions in the home; as well as parents failure to take child to his doctor appointments for his lead issues.

(3)

The parents were, subsequently, referred for Reunification Services through Family Intervention Crises Services (FICS).

14. Although the reunification services began on December 12, 2012, the reunification team was unable to get into the home until February10, 2013, to try to help the parents remedy the conditions which led to the removal of the children.

15. In August of 2013, a home inspection of the home of Child's parents determined the house to be practically uninhabitable due to numerous structural problems.

16. During the first six month of reunification, the parents refused any offer of help from the reunification team to clean and organize the house, and limited the reunification counselor's access to the home, the same way as they had done previously with CYS case workers.

17. Father attended 52% and Mother attended 48% of their sessions with the reunification counselors, and when they attended the sessions they were uncooperative, argumentative with the counselors, insisting that there were no problems with their home. During one visit (April 2, 2013), the parents kicked the reunification counselors out of the house in the middle of a session and telling them "I'll fucking kick your asses and see you at court".

18. During the visits with their children, Parents often ignored Child and left him alone to play. Parents allowed Child, who was only 3 years old, to go to the bathroom by himself: and often left alone during the visits to fend for himself. . Child's mother became annoyed when she was told by reunification counselors to take Child to bathroom, or to spend as much time with him as she spends with Child's sisters.

(4)

19. Even during visits which were supervised by the service providers, at times, Child was left unsupervised by his parents. The parents were, often, unable to coordinate some type of arrangement to take turn to watch Child, and respond to his emotional and physical needs.

20. Parents often struggled to understand and deal appropriately with Child's developmental needs, and did not know how to co-parent in order to meet his developmental and emotional needs.

21. When Child arrived in his first foster home      ; he smelled bad and had practically no dinner table etiquette.

22 Child was unable to speak and use age appropriate language to ask for things to meet his physical, and emotional needs (hunger, hurt, etc.).

23. Child was terrified of being bathed and washed to the point that the foster parents could only clean him by giving "sponge bath" only. Child was also afraid of rain, or getting wet altogether.

24 When first arrived at his first foster home, Child showed no affection, or reaction to others, and took him a while to learn it was Ok to interact with trusted people. When interacting with others, Child was unable to differentiate between strangers and people who cared about him.

25. When Child got hurt, or got sick, he did not cry or look to his foster parents for comfort and protection. He would simply make some gestures and try to deal with it on his own and move on.

26. By the time Child moved to his permanent foster home       , he had made significant progress regarding all the areas mentioned above.

(5)

27 Child's current foster parents are continuing the work with him and his needs and continue to meet his physical and emotional needs.

28. Child's former foster mother) and J.T. (Child's sibling's kinship foster mother) both have seen tremendous amount of improvement with Child behavior, and issues, since he was removed from the care and custody of his parents.

29 Child also receives therapeutic services for his boundary issues, social connectedness, focus skills, and language therapy from Dr. Rachael Love, a psychologist whose qualifications were not challenged.

30. Doctor Love supports Child's placement with the foster family and believes that the current foster parents meet Child's physical and emotional needs.

31. Dr. Love opined that remaining in his current foster parents would best serve the needs and welfare of Child, and under no circumstances it is in his best interest to be moved from his current home, for the third time.

## SUGGESTED CONCLUSIONS OF LAW

1. Pursuant to 23 Pa.C.S.A. § 2511, the rights of a parent in regard to a child may be terminated after a petition filed on any of the following ground:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> The child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or

(6)

placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(2), (5), and (8).

2. Relative to Section 2511(b), the Pennsylvania Superior Court has provided the following guidance:

Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child. The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanency severing the bond...The court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. Most importantly, adequate consideration must be given to the needs and welfare of the child.

In re: Adoption of C.L.G., 956 A.2d 999, 1013-14 (Pa. Super. 2008) (internal and external citations omitted).

3. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. In re: J.L.C., 837 A.2D 1247 (Pa. Super. 2003).

(7)

4. The focus of involuntary termination proceedings is on the conduct of the parents and whether their conduct justifies termination of parental rights. In re: Child M., 681 A.2d 793 (Pa. Super. 1996), *appeal denied* 546 Pa. 674, 686 A.2d 1307 (1996).

5. The affirmative duty on the part of a parent to work towards the return of his or her child has been determined to require, at a minimum, the parent to "show a willingness to cooperate with CYS to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligation inherent in parenthood." In re: V.E. and J.E., 611 A.2d 1267, 1271 (Pa. Super. 992), *citing* In re: Adoption of J.J., 515 A.2d 883, 889 (Pa. 1986).

6. "If a parent fails to cooperate or appears incapable of benefiting from the reasonable efforts supplied over a realistic period of time, CYS has fulfilled its mandate and upon proof of satisfaction of the reasonable good faith effort, the termination petition may be granted." In re: A.R., 837 A.2d 560, 564 (Pa. Super. 2003) (citation omitted).

7. If a parent fails to cooperate or appears incapable of benefitting from the reasonable efforts supplied over a realistic period of time, a termination petition may be granted. In re: A.R., 837 A.2d 560 (Pa. Super. 2003).

8. "The continued attachment to the natural parents, despite serious parental rejection through abuse and neglect, and failure to correct parenting and behavior disorders which are harming the children cannot be misconstrued as bonding." In the Matter of K.K.R., 958 A.2d 529, 535 (Pa. Super. 2008) (citation omitted).

(8)

## REASONING

Ample evidence has demonstrated throughout the entire proceeding that a dangerous condition existed in the home of the parents and that the child had to be removed for the welfare of the child. After that removal, the parents became very uncooperative and bordered on being indignant and obstructionists. Numerous accounts were given regarding the inability of caseworkers to even gain entry to the home or to get either of the parents on a telephone call.

The level of indignant response by the parents was most amply demonstrated during the hearing by Mother's disgust and outrage that a female CYS worker requested that she must witness the collection of a urine sample to verify that Mother was not falsifying that urine sample for the detection of drugs. This "indignity" gave rise to an open and hostile relationship between CYS and the parents which continued to fester and which brought down any efforts by CYS to restore this family to a functioning level that would allow for the return of the children. While the Court acknowledges that the act of expelling urine from one's own body requires a certain level of privacy, the Court finds that it is not unreasonable that workers of the same gender be in the room while the sample is collected to assure and verify that tampering is not done. This simple verification process takes place daily in every county in this nation and was not a form of harassment or "indignities" designed by Centre County Children and Youth Services to embarrass or to harass Mother.

(2)

Just as important in the Court's mind, and apart from the parents' inability and unwillingness to cooperate with CYS, is the stark improvement evidenced by those who are around MCT since he has been living with the foster families involved in this case. The child has gone from a dialogue of not more than four words, and having abject fear of water and bathing to a well-developed and prospering five year old. Those most familiar with his care and treatment have seen remarkable and outstanding progress for the child while in custody.

Lastly, the Court is not convinced the attention paid by the child during visits with the family represents any meaningful stumbling block or hurtle to the plan to move forward with the termination of the parents' parental rights. Familiarity and affection are basic human instincts, but they are not sufficient to rescue the foundation of this child's family from its ruinous and neglectful origins.

## **ORDER**

AND NOW, this 23rd day of September, 2014, upon consideration of the Petition for Involuntary Termination of Parental Rights filed by Centre County Children and Youth Services in the above-captioned matter, and the evidence and testimony offered at the time of hearing, it is hereby ORDERED and DECREED that all of the parental rights and duties of the biological father, R.T. and of the biological mother, C.N. , are hereby forever terminated in accordance with the Act of October

(10)

15, 1980, P.L. 934, No. 163 (23 Pa.C.S.A. Section 2511), specifically pursuant to

Sections 2511(a)(2), 2511(a)(5), and 2511(a)(8).

The custody of 1 M . C . T. shall remain with Centre County

Children and Youth Services, and the agency shall have the right to proceed with an

adoption of this child without further notice to, or the consent of, either of the biological

parents, namely, R . T . and C . N .

The Court further finds that the current placement goal of M . C . T . ,

, that of Planned Permanent Living Arrangement/Long-Term Foster Care is NOT

appropriate and/or NOT feasible, in that termination of parental rights of the biological

parents has been granted. The Court ORDERS the new permanent placement goal to be

that of ADOPTION.

## NOTICE TO PARENTS:

You have a continuing right as a parent to voluntarily place on file and update social and medical history information, whether or not the medical condition is in existence or discoverable at the time of the present adoption. The information you choose to provide could be important to the child's present and future medical needs. Requests to release the information will be honored if the request is submitted by any of the following:

a) An adoptee who is at least 18 year of age;

b) An adoptive parent of an adoptee who is under 18 years of age, or adjudicated incapacitated or deceased;

c) A legal guardian of an adoptee who is under 18 years of age or adjudicated incapacitated;

d) A descendant of a deceased adoptee;

e) A birth parent of an adoptee who is at least 21 years of age;

f) A birth grandparent of an adoptee who is at least 21 years of age; provided the birth parents consents, is incapacitated, or deceased; and

g) A birth sibling of an adoptee if both the birth sibling and the adoptee are at least 21 years of age; and

(11)

- The birth sibling remained in the custody of the birth parent, and the birth parent consents, is deceased, or adjudicated incapacitated;
- Both the birth sibling and the adoptee were adopted out of the same birth family; or
- The birth sibling was not adopted out of the birth family and did not remain in the custody of the birth parent.

All information will be maintained and distributed in a manner that fully protects your privacy.

You may obtain the appropriate form to file social and medical history information by contacting the Pennsylvania Adoption Information Registry at the following address and/or phone number:

Department of Public Welfare
Pennsylvania Adoption Information Registry
www.pagov.pair.org
P.O. Box 4379
Harrisburg, PA 17111-0379
Telephone: 1-800-227-0225

Social and medical history information forms may also be obtained locally by contacting one of the following agencies:

1. Your county's Children and Youth Services Agency;
2. Any private licensed adoption agency;
3. Your county Register and Recorder's Office; and
4. Online at http://www.adoptpakids.org/Forms.aspx.

BY THE COURT:

_____
Thomas King Kistler, President Judge

(12)