J-S11032-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.H.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: W.J.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1598 WDA 2025 |

Appeal from the Order Entered November 26, 2025
In the Court of Common Pleas of Allegheny County Orphans' Court at
No(s): CP-02-AP-0000035-2025

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY LAZARUS, P.J.:          **FILED: April 29, 2026**

W.J.F. (Father) appeals from the order, entered in the Court of Common Pleas of Allegheny County, Orphans' Court Division, involuntarily terminating his parental rights to his daughter, Z.H.G. (Child) (born November 2021). After careful review, we affirm on the basis of the opinion, authored by the Honorable David L. Spurgeon, with respect to involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1) and (b).

Allegheny County Office of Children, Youth, and Families (CYF) first became involved with Child's family in April 2023 when Child's mother, A.A.,[1] was found passed out on a bench with Child in a baby carriage. *See* N.T. Termination Hearing, 10/23/25, at 18-19.  Mother, who was intoxicated, tried to flee when police and paramedics responded to the scene. *Id.* at 19.  In the

---

[1] The court also involuntarily terminated Mother's parental rights to Child.  She is not a party to this appeal.

process of fleeing, Mother let go of the baby carriage. *Id.* Police officers grabbed the carriage before it entered oncoming traffic. *Id.* Following an emergency shelter care hearing[2] held on April 14, 2023, Child was placed with a foster family, with whom she resided at the time of the termination hearings. *Id.* at 19, 67.

Child was adjudicated dependent on June 7, 2023. At the adjudicatory hearing, which Father attended, Father was ordered to contact the agency, participate in visits with Child, and work with an engagement specialist. *Id.* at 24, 32. Because Father did not provide CYF with his address, he was never assessed for services. *Id.*

Father moved out of state around October 2023 and returned to Pennsylvania for one month in January 2024. *Id.* at 34, 77. Father then moved back to Florida from February 2024[3] through April 2025, when he returned to Pennsylvania. *Id.* at 77-78. On March 14, 2025, CYF filed a petition to involuntarily terminate Father's parental rights to Child. Father moved out of state again in September 2025 and failed to communicate with CYF. *Id.* at 32-33, 35.

_____

[2] Father did not attend because his whereabouts were unknown. *Id.* at 20.

[3] On June 26, 2024, the court entered an aggravated circumstances order against Father, concluding he had failed to maintain substantial and continuing contact with Child for a period of six month and finding that no efforts were to be made to reunify Child with Father. *Id.* at 27; *see also* Aggravating Circumstances Order, 6/26/24, at 1; 42 Pa.C.S.A. § 6302(1)(ii) (defining "Aggravating Circumstances"); *id.* at § 6341(c.1).

The court held a two-day termination hearing[4] in October and November 2025. At the October 2025 termination hearing, CYF caseworker Kristian Levan testified Father had not had any visits with Child until "recently," when he visited her four times with Mother.[5] *Id.* at 28. *See also id.* at 43 (Father did not start visiting Child until June 9, 2025); *id.* at 55-56 (Father did not visit Child from August 2025 to September 2025 or from September 8, 2025 to October 20, 2025). However, Wesley Family Services foster care coordinator Christelle Deffenbaugh testified that Father and Child interacted well during visits and that it seemed as though there was a "type of bond" between them. *Id.*

CYF permanency caseworker Heidi Hyson testified that her role is to work on finding an adoptive home for Child. *Id.* at 68. She testified that foster mother is very bonded with Child, meets all of Child's emotional, physical, and medical needs, and is very hands-on with Child. *Id.* at 65-67.

---

[4] Erin Krotoszynski, Esquire, an attorney with KidsVoice, a nonprofit agency that provides legal representation for children in Allegheny County Juvenile Court dependency matters, served as Child's legal counsel and guardian *ad litem* (GAL) at the termination hearing. *See* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings); *In re K.R.*, 200 A.3d 969 (Pa. Super. 2018) (en banc), *but see In Re: T.S., E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."). Attorney Krotoszynski told the court that KidsVoice could represent then-three-year-old Child without any conflict. *See* N.T. Termination Hearing, 11/25/25, at 4.

[5] Father never had any one-on-one visits with Child since she was adjudicated dependent. *Id.* at 43.

Caseworker Hyson also testified that she would recommend foster mother as an adoptive resource for Child. *Id.* at 67.

Father testified that he and Mother lived with Child for five months following Child's birth. *Id.* at 70. In July 2022, Father moved to Florida after he was released from serving a jail term in Pennsylvania and had "lost [his] apartment[,] didn't know where [Mother] was[, and] lost [C]hild." *Id.* at 70, 75. Father returned to Pennsylvania in June 2023 and left the Commonwealth again in October 2023 for work reasons. *Id.* at 73. At that time, Father testified he did not have a telephone number, but did have email, and was unaware that he could have contacted CYF to arrange for virtual visits with Child. *Id.*

Forensic psychologist Dr. Eric Bernstein testified that in June, July, and August 2025, he conducted individual and group evaluations—one with Child and Mother, another with Child and foster mother, and individual evaluations with Mother and Father. *Id.*, 11/25/25, at 34-35. Doctor Bernstein also submitted an addendum to the evaluations on September 26, 2025. Based on his observations, Dr. Bernstein testified that Child and foster mother have a secure attachment, Child's foster home is a safe environment, and that he had no safety concerns with regard to Child being in foster mother's care. *Id.* at 36-37.

With regard to Father, Dr. Bernstein noted that Father had not been a part of Child's life for approximately 15 months and that he had concerns about Father's lack of consistent involvement with Child and his ability to

parent. *Id.* at 39-40. Doctor Bernstein also testified he was concerned about Mother and Father's unstable relationship and how it would "impact his role as a father to [Child], especially[] when there are remaining concerns and questions about [intimate partner violence (IPV)]." *Id.* at 40. In his addendum, Dr. Bernstein "remained unable to address [Father's] permanency and reunification with [Child]." *Id.* at 46. Because Dr. Bernstein did not have a chance to observe Father and Child interact, he could not better assess whether termination of Father's rights would be in Child's best interests. *Id.* at 54.

At the time of the termination hearings, Father had not completed any of his court-ordered goals, which included attending an IPV program,[6] and had never achieved anything above minimal compliance and progress throughout the life of the case. *Id.*, 10/23/25, at 29-30. Father failed to maintain contact with CYF throughout the life of the case. *Id.* at 25. CYF caseworker Levan testified that terminating Father's parental rights would serve Child's needs and welfare, especially where she is bonded to her foster mother, is "loved and cared for in her [foster] home[, and where her foster mother] has been meeting all of [Child's] medical and educational needs." *Id.* at 29-31, 36.

---

[6] In July 2023, Mother filed a protection from abuse act (PFA) petition against Father. *Id.* at 38. The petition alleged that Father had pushed and "squeezed" Mother and allegedly injured Mother's finger. *See id.*, 11/25/25, at 45 (forensic psychologist testifying Mother's PFA petition alleged she "felt afraid and sought [a] medical examination" after incident with Father). No PFA order was in effect against Father at the time of the termination hearings. *Id.*

On November 26, 2025, the court entered an order involuntarily terminating Father's parental rights to Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[7]  Father filed a timely notice of appeal and a contemporaneous Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.  *See* Pa.R.A.P. 1925(a)(2)(i).  Father presents the following issues for our consideration:

> (1)    Did the trial court abuse its discretion and/or err as a matter of law by involuntarily terminating Father's parental rights pursuant to [subsections] 2511(a)(1), (2), (5), and (8)?
>
> (2)    Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYS met its burden of proving by clear and convincing evidence that termination of Father's parental rights would best serve the needs and welfare of [C]hild pursuant to [section] 2511(b)?

Father's Brief, at 3.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.  The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  It is well[-]established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence[,] in light of the totality of the circumstances[,] clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted).  *See also In the Int. of K.T.*, 296 A.3d 1085 (Pa. 2023) (section 2511 requires bifurcated analysis where party seeking termination of parental

---

[7] 23 Pa.C.S.A. §§ 2101-2938.

rights first bears burden of proving, by clear and convincing evidence, one of eleven grounds for termination under subsection 2511(a) exist before moving on to determine whether termination meets needs and welfare of child under subsection 2511(b)).

We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

Father claims that the court erred by terminating his parental rights under subsections 2511(a)(1), (2), (5), (8), and (b). After reviewing the parties' briefs, the certified record on appeal, and relevant statutory and case law, we conclude that Judge Spurgeon properly determined that Father's parental rights to Child should be involuntarily terminated. *In re A.R.*, *supra*. Father only cared for Child for the five months immediately following her birth. *See* N.T. Termination Hearing, 10/23/25, at 32. After Child was adjudicated dependent in June 2023, Father failed to visit Child in 2023 or 2024 or call CYF to schedule visits. *Id.* at 62. Over the life of this case, Father attended a total of four visits with Child in 2025. *Id.* Father never sent Child gifts or cards from April 2022 through June 2025. *Id.* at 80. Simply put, for the nearly 2½ years Child has been in foster care, Father has failed to perform parental duties. *See* 23 Pa.C.S.A. § 2511(a)(1).

Moreover, Child has been living, since her placement, in an approved pre-adoptive foster home with a foster mother to whom she is bonded, calls

"mom," and who provides for Child's developmental, physical, and emotional needs and welfare. ***See id.*** at § 2511(b). Finally, CYF caseworker Levan testified that terminating Father's parental rights would serve Child's needs and welfare. ***See In the Int. of K.T.***, 296 A.3d at 1107 (under subsection 2511(b), courts must consider whether trauma of breaking any existing parent-child bond is outweighed by benefit of moving child toward permanent home); ***In re T.S.M.***, 71 A.3d 251 (Pa. 2013) (existence of unhealthy and pathological parent-child bond severed in order to permit children be placed in healthy, permanent foster homes).

We rely upon Judge Spurgeon's opinion to affirm the order involuntarily terminating Father's parental rights to Child under subsections 2511(a)(1) and (b).[8] We instruct the parties to attach a copy of Judge Spurgeon's decision in the event of further proceedings in the matter.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 4/29/2026

---

[8] We can affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection under 23 Pa.C.S.A. § 2511(a). ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc). Even though we rely on the trial court to dispose of this appeal, we do so solely on the basis of affirming termination under subsections 2511(a)(1) and (b).