J-A03039-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| TERM. OF PAR. RIGHTS TO J.J.N.P., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.S., NATURAL MOTHER | : : : : : : | |
| | : | No. 1206 MDA 2020 |

Appeal from the Order Entered August 24, 2020
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s):  OC-38-2018

BEFORE:  LAZARUS, J., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, J.:                     **FILED FEBRUARY 25, 2021**

A.S. (Mother)[1] appeals from the order, entered in the Court of Common Pleas of Huntingdon County, terminating her parental rights to her minor daughter, J.N.J.P. (Child)[2] (born 7/12).  After careful review, we affirm.

_____

[1] Father's case is on appeal to this Court at 1229 MDA 2020.

[2] The trial court appointed Roberta Binder Heath, Esquire, as guardian *ad litem* for Child.  Michael M. Kipphan, Esquire, is Child's legal counsel.  **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 2018 PA Super 334 (Pa. Super. filed Dec. 10, 2018) (en banc) **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

Child has resided with A.K. and S.K. (Foster Parents) since she was seven weeks old. Mother asked Foster Parents to take care of Child because Mother was struggling with substance abuse. Mother presumptively believed that Z.P., Foster Parents' son, was Child's father; Z.P. and Mother were dating at the time of Child's birth.[3] DNA testing, however, later proved that B.F. (Father)[4] was Child's biological father.[5] In a separate custody action,[6] a Blair County trial judge entered an order granting sole physical custody of Child to Foster Parents and shared legal custody of Child to Foster Parents and Father on December 17, 2014. The custody order permitted Father to visit with Child every other weekend from Friday at 5:00 p.m. until Tuesday at 7:00 p.m.[7]

_____

[3] Z.P. is named on Child's birth certificate as her father.

[4] Father moved to Ohio in 2013-2014 and had not had personal contact with Child since that time.

[5] According to Foster Father, B.F discovered he was Child's natural father when Child was approximately 10 months old. N.T. Termination Hearing, 7/8/19, at 121.

[6] Foster Parents filed a custody action in Blair County, seeking custody of Child, against Mother and presumptive father, Z.P. Father later intervened in the matter. N.T. Termination Hearing, 10/8/19, at 102-03. In 2018, paternal aunt filed a petition to intervene in the custody matter, alleging abuse by Foster Parents. Father's Proposed Findings of Fact and Conclusions of Law, 7/8/20, at 1. That motion to intervene was denied. On April 24, 2019, the custody case was transferred to Huntingdon County.

[7] Mother was not permitted visitation with Child, as she was incarcerated at the time the custody order was entered. Mother had been incarcerated in 2014 on felony theft and burglary charges; she was ordered to serve a

On November 20, 2018, Foster Parents[8] filed petitions to involuntarily terminate Mother's and Father's parental rights to Child, with the intent to adopt Child. **See** 23 Pa.C.S. § 2512(a)(3) (petition to terminate parental rights with respect to child under 18 may be filed by "[t]he individual having custody or standing *in loco* parentis to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt)"); **see also** N.T. Termination Hearing, 7/8/19, at 18 (Foster Mother testifying she and Foster Father intend to file petition to adopt Child); **Id.** at 106 (Foster Father testifying to same).[9] At a termination hearing held on July 8, 2019, the court heard testimony from Foster Parents. Foster Mother testified that the last time Mother saw Child in person was in 2014; however,

---

sentence of one to five years in prison. Mother was released in August of 2016; however, due to multiple parole violations (which included drug use), she was re-incarcerated. Mother admitted she relapsed in 2017. N.T. Termination Hearing, 10/8/19, at 82.

[8] Several court documents refer to Foster Parents as Paternal Grandparents. However, because Z.P. is not, in fact, Child's biological father, Foster Parents are not Child's biological grandparents. Thus, we refer to them as Foster Parents throughout this decision.

[9] We recognize that, effective December 28, 2020, subsection 2512(b)(3) was added to section 2512, providing that a parent-petitioner whose child was conceived as a result of rape or incest by the other parent need no longer aver that an adoption is presently contemplated or that a person with a present intention to adopt exists. **See** 23 Pa.C.S. § 2511(b)(3); **see also** Act 2020-95 (H.B. 1984), § 1, approved October 29, 2020, eff. December 28, 2020; **see also In the Interest of Z.E.**, 221 A.3d 260 (Pa. Super. 2019) (memorandum per curiam) (non-precedential decision).

Foster Mother also admitted that she has been ignoring Mother's attempts to contact her and reestablish her relationship with Child since at least October of 2018 and, possibly, as far back as 2017. *Id.* at 42-47. Foster Mother admitted that Foster Father had been convicted of the summary offenses of harassment (2017), criminal mischief (2017), and disorderly conduct (2013).[10] *Id.* at 61-62. Finally, Foster Mother testified that Father had been sending $24/week in court-ordered child support for Child since 2016 or 2017. *Id.* at 85.

On October 8, 2019, Mother and Paternal Grandmother testified at a second termination hearing. Mother testified that she had been incarcerated in 2015 for a drug-related offense,[11] a problem she has had since she was thirteen years old. N.T. Termination Hearing, 10/8/19, at 4-5. Specifically, Mother testified that she is addicted to heroin and opioids, but has been sober since February 2016, when she was released from incarceration resulting from a parole violation, and is now a certified recovery specialist. *Id.* at 5-6, 14; *see supra* at n.6. Mother later clarified that she had, in fact, relapsed with

_____

[10] Foster Mother also testified that there has been no finding against her or her husband by Huntingdon County Children and Youth Services Agency (CYS). N.T. Termination Hearing, 7/8/19, at 13-14. However, this testimony was challenged at a later termination hearing when Mother recalled Foster Parents to the stand to testify.

[11] Mother also testified she had been convicted in 2015 of theft and burglary, both felonies, and she violated her parole on this sentence which led to her incarceration in 2016. *Id.* at 25.

drug use in 2017, was re-incarcerated, and then released from prison in August 2017. *Id.* at 82. Thus, she has been sober since 2017, not 2016. Mother also testified she completed several drug and alcohol outpatient programs and is currently in recovery. *Id.* at 11.

Mother has a 10-month old son, R.S., who lives with her and her fiancé. *Id.* at 17-18.[12] Mother testified that she has tried to contact Child by using Facebook Messenger with Z.P. and Foster Father, texting Foster Mother's cell phone, trying several different phone numbers through Paternal Grandmother, and calling Foster Mother's sister, parents, and children. *Id.* at 34. Mother's attempts to contact child began in 2016 after she was released from prison and occurred as late as October of 2018, with the exception of a text message she sent to Foster Mother on June 8, 2019—less than six months from the date the termination petition was filed. *Id.* at 45-46, 49. Mother acknowledged that Foster Mother had blocked her from texting her. *Id.* at 52. Mother has not had physical contact with Child since 2014. At the time of the hearing, Mother was unemployed; her fiancé is also an unemployed felon.

In October of 2018, Mother filed a *pro se* custody petition to modify custody in Blair County; the petition was pending at the time of the termination hearing. On November 25, 2019, Mother filed a motion to produce

---

[12] Mother has a third child, A.S., who was adopted by a third-party and was turning six years old the day after the October termination hearing. *Id.* at 19.

records from Blair County Children and Youth Services Agency and Huntingdon County Children and Youth Services Agency regarding Foster Mother.

In the wake of the COVID-19 pandemic, the court scheduled a videoconference termination hearing which was held on May 28, 2020.  Father and Foster Parents testified at that hearing.[13]  At the hearing, Mother's counsel brought forth records from Huntingdon County Children and Youth Services (CYS) indicating that CYS had referred Foster Mother to services for parent substance abuse, inappropriate discipline and mental health concerns.  N.T. Videoconference Termination Hearing, 5/28/20, at 53.  Counsel and the court noted that there was no record of dependency in any case with regard to Child and Foster Parents.  *Id.* at 56.  Foster Mother denied any of the incidents alleged in those records, specifically denying that she had any substance abuse issues or that she had ever been admitted to an inpatient rehabilitation facility.  *Id.* at 57.  Mother rebutted Foster Mother's denials with a 2012 consent agreement Foster Mother had entered into with the Pennsylvania Bureau of Profession and Occupational Affairs stating that Foster Mother does not deny her addiction (alcohol dependence disorder), that she welcomes the opportunity to continue her recovery under the supervision of the State Board of Nursing, and that Foster Mother's nursing license was indefinitely suspended for no less than three years, but that the suspension was immediately stayed in favor of no less than three years of probation, subject

---

[13] Mother recalled Foster Parents at this hearing.  *See supra* at n.10.

to terms including receiving treatment for her addiction. *Id.* at 57-60. Mother introduced evidence that Foster Mother violated her probation by failing to submit to alcohol testing and, thus, the stay was lifted and her license was indefinitely suspended for no less than three years. *Id.* at 63-64. Foster Father testified at the hearing that in August of 2019, he had been charged with driving under the influence of alcohol and was later accepted into ARD.

Following the hearing, the court ordered the parties to submit proposed findings of fact and conclusions of law by July 10, 2020. On June 5, 2020, Child's attorney filed a statement indicating that he had met twice with Child and "[b]ased upon [his] interviews of [C]hild, it is [his] position that [Child] does not know who [Mother] and [Father] are." Statement Pursuant to Directive of the Court, 6/5/20, at 1. Additionally, counsel stated that after observing Foster Mother and Child, they "show a well[-]bonded 'parent'[-]child relationship . . . [and that Child] states that [Foster Mother] is [Child's] mother." *Id.* at 2.

On August 24, 2020, the trial court granted Foster Parents' petitions and involuntarily terminated Mother's and Father's parental rights to Child pursuant to sections 2511(a)(1) and (b) of the Adoption Act.[14] Mother filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. On appeal, Mother presents the following issues for our consideration:

---

[14] 23 Pa.C.S. §§ 2101-2938.

(1)   Did the court below abuse its discretion in terminating []
Mother's parental rights to [] Child, when substantial
evidence showed that [] Mother made prolonged efforts at
reunification?

(2)   Did the court below abuse its discretion in terminating []
Mother's parental rights to [] Child, when the indisputable
evidence showed that [] Foster Parents had actively worked
to prevent [] Mother from having any contact or relationship
with [] Child?

(3)   Did the court below abuse its discretion in finding that
termination of [] Mother's parental rights would be in []
Child's best interests, when substantial evidence
demonstrated that [Foster Parents] had serious substance
abuse, anger, and violence issues?

(4)   Did the court below abuse its discretion in finding that
termination of [] Mother's parental rights would be in []
Child's best interests, when substantial evidence
demonstrated that [] Mother had previously had a close and
loving relationship with [] Child and that she has a similar
relationship with her other children?

Mother's Brief, at 2-3.

We review a trial court's decision to involuntarily terminate parental

rights for an abuse of discretion or error of law.  **In re A.R.**, 837 A.2d 560,

563 (Pa. Super. 2003).  Our scope of review is limited to determining whether

the trial court's order is supported by competent evidence.  **Id.**

In a proceeding to terminate parental rights involuntarily, the
burden of proof is on the party seeking termination to establish
by clear and convincing evidence the existence of grounds for
doing so.  The standard of clear and convincing evidence is defined
as testimony that is so "clear, direct, weighty[,] and convincing as
to enable the trier of fact to come to a clear conviction, without
hesitance, of the truth of the precise facts in issue."  It is well[-]
established that a court must examine the individual
circumstances of each and every case and consider all
explanations offered by the parent to determine if the evidence in

- 8 -

light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

In her first issue on appeal, Mother contends that the trial court erred in terminating her parental rights to Child where she made "prolonged efforts at reunification." Mother's Brief, at 2.

Instantly, the trial court terminated Mother's parental rights under section 2511(a)(1), which states:

> General rule. — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S. § 2511(a)(1). Under section 2511(a)(1), however, a trial court should also consider the entire background of the case and not simply

> mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his [or her] . . . parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004).

In its memorandum accompanying the termination order, the trial court supported its decision to terminate Mother's and Father's parental rights as follows:

> [T]he issue is whether these parents or either of them have failed to perform parental duties with respect to [Child]. Ha[s] either affirmatively demonstrated parental devotion to and extended themselves to maintain a place of importance in the life of [Child]. The answer[] to these questions is unequivocal. Neither parent did anything to establish a relationship with [Child] until years after their separation from [Child]. In this case[,] the factor that is egregious is that at all times[,] each parent had a remedy to assert their right as a parent since each is a defendant in an open custody action concerning [Child] and each could have at any time returned to court to claim their right to a relationship with [Child]. [Father] has the benefit of a court order awarding him [shared] legal . . . custody of [Child] and yet, no affirmative action was taken until October [] 2018, when [Mother filed] a petition to modify. . . . [Foster Parents] have at all times been the parents of [Child] and no evidence suggested that they have failed in any way to provide [Child with] the "love, protection, guidance[,] and support" [Child] needs and deserves. [Foster Parents] have been and are [Child's] parents. Therefore we will grant their petitions.

Memorandum, 8/24/20, at 22-23. In its Rule 1925(a) opinion, the court further explained its reasons for terminating Mother's and Father's parental rights to Child:

> In this case[,] the evidence was unequivocal that each parent elected to absent themselves from the life of [Child] since 2012 in the case of [Mother] and since 2015 in the case of [Father]. At all times[,] either could have sought assistance from the Blair County Court of Common Pleas to assist in establishing a relationship with [Child], but it was not until October 2018 that [Mother] sought help. In our view, this delay defeats any argument that [Foster Parents] bear responsibility for the fact that there is no relationship between [Child] and her natural parents. Their conduct is the reason their parental rights were terminated.

- 10 -

Rule 1925(a) Opinion, 10/6/20, at 3. Moreover, the trial court recognized that despite the fact that Mother "improved her expectations" since her release from prison in 2016, it does not change the fact that there was "clear, undisputed evidence [that] established that both parents[,] for a period of years[,] abandoned [Child]." *Id.* at 4. As a result, the court "gave no weight to this evidence[,] since in the final analysis[,] neither parent took affirmative steps toward establishing a relationship with [Child] until, in [its] view, it was too late." *Id.* at 5. Considering the entire background of this case, as we must, *In re B., N.M*, *supra*, we agree that termination under section 2511(a)(1) is warranted where Mother did not affirmatively perform her parental duties for years and, as a result, "failed to maintain a place of importance in Child's life." *Id.* at 855.

Mother next claims that Foster Parents "actively prevented [her] from contact with . . . [Child]" and that Mother's failure "to perform her parental duties . . . [were] directly caused by the Foster Parents' actively blocking [her] efforts to have contact with . . . Child." Mother's Brief, at 15.

Mother is correct in her assertion that "if the failure to perform parental duties results from obstructive tactics, such failure is excused." *In re Baby Boy H.*, 585 A.2d 1054, 1056 (Pa. Super. 1991) (citation omitted). However, in *In re Adoption by Shives*, 525 A.2d 801 (Pa. Super. 1987), our Court noted:

> The law recognizes . . . that there are situations in which a
> custodial parent has deliberately created obstacles and has[,] by
> devious means[,] erected barriers intended to impede free

communication and regular association between a noncustodial parent and his or her child. Therefore, it is incumbent upon a court, before it terminates the rights of a noncustodial parent, to consider carefully the noncustodial parent's explanation, if any, for his or her apparent neglect. Only where the totality of the circumstances demonstrates clearly and convincingly that a parent has refused or failed to perform parental duties for a minimum period of six months may an order be entered terminating parental rights. ***In re Santelia***, [] 465 A.2d 21, 23 ([Pa. Super.] 1983). **The pertinent inquiry is not the degree of success a parent may have had in reaching the child, but whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship.** ***In re Adoption of Faith M.***, [] 501 A.2d [1105,] 1108 [Pa. (1984)].

***Id.*** at 803 (emphasis added). ***See also In re Baby Boy H.***, ***supra*** at 1056 ("To obtain the benefit of this excuse, a parent must exhibit reasonable firmness in attempting to overcome the obstructive behavior.").

As the trial court aptly noted, Mother allowed years to elapse before attempting to contact Child after Mother voluntarily placed Child with Foster Parents, just weeks after Child's birth. Moreover, while Mother may have been incarcerated for a portion of this time, it is well-established that our courts "are not willing to completely toll a parent's responsibilities during his or her incarceration." ***In re Adoption of McCray***, 331 A.2d 652, 655 (Pa. 1975). Rather, a parent must "utilize[ all] those resources at his or her command while in prison in continuing a close relationship with [C]hild." ***Id.*** Under the facts of this case, Mother not only failed to maintain contact with Child, but neglected to even attempt contact for years, including failing to file any

petition to modify custody in the parties' custody case, and failing to send[15] cards or gifts or make any phone calls to Child. Notably, Mother testified that she "wasn't ready" before 2016 to have contact with Child. N.T. Termination Hearing, 10/8/19, at 118. However, our courts have held that "[p]arental rights are not preserved . . . by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical or emotional needs." **Adoption by Shives**, **supra** at 804. Thus, we find no merit to this issue. **In re B., N.M.**, **supra** at 856 (where father's actions "were not proactive for most of Child's life and he offered insufficient excuses to explain his inaction," termination proper under section 2511(a)(1), despite obstacles mother placed before him).

Mother also contends that the trial court improperly terminated her rights to Child where "substantial evidence demonstrated that the [Foster Parents] had serious substance abuse, anger, and violence issues." Mother's Brief, at 3.

It is well-established that "[t]he focus of the termination proceeding is on the **conduct of the parent** and whether his or her conduct justifies termination of parental rights." **In re B.L.L.**, 787 A.2d 1007, 1013 (Pa. Super. 2001) (emphasis added). Thus, Mother's focus on Foster Parents' conduct is irrelevant to the trial court's termination decision; rather, their suitability as

---

[15] While Mother testified that she had purchased back-to-school items and Christmas gifts for Child, she admitted she never attempted to send Child anything. N.T. Termination Hearing, 10/8/19, at 116.

parents would be relevant in a custody or subsequent adoption proceeding. Moreover, Mother's claim is disingenuous where she, herself, testified that she thinks it is best for Child that [Child] continue to live with Foster Parents. N.T. Termination Hearing, 10/8/19, at 79 (expressing desire for Child "to continue to live with [Foster Parents], that [Foster Parents] allow me to speak to [Child], get visitations of [Child], allow [Child] to know who I am, [and] allow [Child] to know who [B.F.] is").

In her final claim on appeal, Mother argues that termination was improper where she "previously had a close and loving relationship with the Child and [] has a similar relationship with her other children." Mother's Brief, at 3.

Child's guardian *ad litem* averred in an affidavit that Child is well-bonded with Foster Parents and does not know Mother and Father as her parents. Moreover, Child's guardian *ad litem* opined that it is in the best interest of the Child to remain with Foster Parents and to terminate Mother's and Father's parental rights. Finally, as stated earlier, Child's attorney interviewed Child twice and noted that Child is well-bonded to Foster Parents, thinks of Foster Mother as her natural mother, and that Child does not know who Mother is.

Mother has not had in-person contact with Child since 2014 or 2015, when Child was two or three years old. There was no evidence that Child knows who Mother is, let alone that she is [Child's] parent. In fact, the evidence strongly suggests the contrary. **See** N.T. Termination Hearing, 10/8/19, at 33 (Q: "Did [Child] seem to recognize you? A: She seemed to

- 14 -

but I still wasn't going to ask. For me to ask [Child] do you know who I am, not only could it traumatize her and ruin what she could have been told or even lied to, it could have ruined her relationship with [Foster Parents] and I wouldn't want to do that."). Where Child's guardian *ad litem* supports termination of Mother's parental rights because Mother and Father have failed to meet Child's needs and welfare for almost all of her life, we agree that termination is in Child's best interests. Thus, we find no merit to this final issue on appeal. ***In re B., N.M.***, ***supra***.

Order affirmed.[16]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/25/2021

_____

[16] Mother, herself, testified that she did not want to take Child away from Foster Parents. N.T. Termination Hearing, 10/8/19, at 34. Perhaps the best avenue for Mother going forward is to seek some sort of mutual agreement to permit her to visit with Child if and when she is adopted. ***See*** 23 Pa.C.S. § 2731 (provides option for adoptive parents and birth relatives to enter into voluntary agreement for ongoing communication or contact that "(1) is in the best interest of the child; (2) recognizes the parties' interests and desires for ongoing communication or contact; (3) is appropriate given the role of the parties in the child's life and (4) is subject to approval by the courts.").