J-A20014-24
J-A20015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: V.U., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: V.U., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1029 EDA 2024 |

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000382-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: B.U., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B. U., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1030 EDA 2024 |

Appeal from the Decree Entered March 8, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000383-2023

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and LANE, J.

MEMORANDUM BY LAZARUS, P.J.:          **FILED SEPTEMBER 27, 2024**

V.U. (born 7/13) and B.U. (born 10/16) (collectively, Children), by and

thorough their attorney, appeal from the decrees, entered in the Court of

Common Pleas of Philadelphia County, involuntarily terminating S.U.'s (Children's Mother's) parental rights to them.[1] We affirm.

In February 2022, the Philadelphia Department of Human Services (DHS) received a general protective services (GPS) report that Mother had been abusing illegal substances and was homeless. The report was deemed valid. DHS learned that Children were residing with Mother in Maternal Grandmother's home. Mother admitted that she had been recently evicted from her home and that she was actively using methamphetamines. Maternal Grandfather[2] agreed to sign a safety plan and have Children and Mother move into his home. DHS provided in-home services for the family that were implemented through the Community Umbrella Agency (CUA). In late-February, Mother informed DHS that she had admitted herself into an inpatient drug and alcohol program. However, only two weeks into treatment, Mother signed herself out of the inpatient facility, threatening to violate CUA's safety plan and remove Children from Grandfather's home.

_____

[1] We have *sua sponte* consolidated V.U.'s and B.U.'s appeals as they involve the same underlying parties and issues. *See* Pa.R.A.P. 513.

[2] Maternal Grandmother told a DHS social worker that she was sick with Stage 4 cancer and could not care for Children. *See* N.T. Goal Change/Termination Hearing, 3/8/24, at 22. At that point, the social worker called Maternal Grandfather who agreed to have Mother and Children move in with him. *Id.* at 22-23.

On March 1, 2022, DHS obtained an order of protective custody (OPC) for Children; Children remained in Grandfather's care.[3] On March 4, 2022, following a shelter care hearing, the court lifted the OPC order and prohibited Mother from contacting and visiting Children. The court held a permanency hearing on March 23, 2022, and ordered supervised, weekly visitation between Mother and Children's older sibling, W.U., Jr.,[4] at DHS.

On April 11, 2022, the following single case plan was developed for Mother: (1) comply with CUA case management[5] and court-ordered services; (2) sign all consent and release forms; (3) obtain suitable housing; (4) address her substance abuse issues; (5) participate in a Clinical Evaluation Unit (CEU) assessment and submit to court-ordered urine drug screens; (6) submit to three court-ordered random urine drug screens; (7) attend a Behavioral Health Forensic Evaluation Center consultation and evaluation; (8)

---

[3] V.U. was also found to have severe truancy issues at the time of DHS' investigation.

[4] Also before this Court are related, *sua sponte* consolidated appeals, Nos. 934-939 EDA 2024, where Mother appeals from the trial court's goal change orders and decrees involuntarily terminating her parental rights to Children and W.U. Because the instant appeal does not involve W.U. and because Children's attorney asked the trial court to grant DHS' termination petition as it related to W.U., we have not consolidated this appeal with the above-mentioned appeal dockets. *See* N.T. Goal Change/Termination Hearing, 3/8/24, at 130.

[5] CUA's case plan objectives for Mother included attaining household management skills, obtaining suitable housing, addressing mental health issues, and managing substance abuse issues. *See* N.T. Goal Change/Termination Hearing, 3/8/24, at 29-30.

address visitation; and (9) attend supervised visits at DHS within line-of-sight and line-of-hearing.

Children were adjudicated dependent on April 18, 2022. Legal custody of Children was transferred to the DHS. Children were placed in kinship care with Grandfather. In June of 2022, Children were moved to the kinship care home of Paternal Aunt (Aunt) and Paternal Uncle. Children were referred for trauma-focused therapy, provided by clinicians at Children's Crisis Treatment Center (CCTC), to address their exposure to Mother's mental health issues, which included hallucinations, delusions, mania, and depression. N.T. Goal Change/Termination Hearing, 1/18/24, at 64; CCTC Treatment Letter, 10/2/23, at 1-2. V.U.'s therapist noted that V.U. suffered from inconsolable crying, had sleep issues, worried, had fears and intrusive thoughts, and was generally sad. *Id.* at 88. Since receiving therapy, V.U.'s therapist said that her sleep issues have improved, but that she still exhibits "a lot of sadness." *Id.* at 89.

B.U.'s therapist, Amatullah Abu Bakr, testified she had only been working with B.U. for a little less than one month at the time of the termination hearing; B.U.'s prior therapist, Ms. Emma Lewi, left the agency in November 2023. *Id.* at 105. Abu Bakr testified that B.U. suffered from PTSD, that he currently seems to be "in a safe and secure placement," and was not currently exhibiting any symptoms. *Id.* at 106-08. Children's therapists collectively recommended that Children continue to participate in weekly, in-person trauma-focused therapy, *id.* at 68, live with a caregiver who can provide them

a stable and safe environment, *id.* at 69, and pause visitation with Mother due to Mother having missed visitation for an extended period of time. *Id.* at 71.

At a September 2023 inter-agency remote meeting, the CCTC therapists did not deem caregiver sessions for Mother clinically appropriate, even though Mother had reached out to begin caregiver sessions, because it had been reported that Mother had missed 11 to 12 supervised visits between June and August of 2023 for an at-the-time unknown reason. *Id.* at 79-80. However, CCTC clinician Cheyenne DuFall testified that during the Zoom meeting in September, she learned that Mother had missed the visits because she was in an in-patient treatment program. *Id.* at 80-81. Despite Mother having reached out to commence the sessions, DuFall testified that, without proof that Mother had successfully completed a drug and alcohol program, CCTC would not have recommended she begin caregiver sessions. *Id.* at 82-83. At the time of the termination hearing, Mother's supervised visits with Children had resumed and were occurring once a week for two hours at the agency. *Id.* at 112. *See also id.* at 113 (DHS attorney stating agency not asking to change Mother's scheduled visitation).

In April and October of 2022, Mother's urine sample tested positive for amphetamines. N.T. Goal Change/Termination Hearing, 1/18/24, at 34, 37. In April 2023, Mother gave birth to a child; both Mother and the infant tested positive for benzodiazepines and amphetamines. *Id.* at 44. Mother admitted to a DHS intake social worker that she had been taking amphetamines and benzodiazepines throughout that pregnancy. *Id.* at 45.

On January 18, 2024, the court held a goal change and contested termination hearing where CEU/Substance Analysis Unit Clerk Scott Signell, DHS Social Worker Nadine Fulton, CCTC Trauma Clinicians Diamond Harper (for V.U.) and Amatullah Abu Bakr (for B.U.), and CUA Case Manager Spencer Vaye testified. Vaye testified that Children are doing very well and thriving in their placement with kinship caregiver, paternal aunt and uncle. *Id.* at 56. Moreover, V.U.'s therapist testified that Aunt participates in V.U.'s therapy, providing her support and acting as the "anchor for [V.U.] in those moments" where V.U. has a "lot of confusion and sadness around inconsistency in the past with [Mother's] visits as well as [her] worries for the future." *Id.* at 92. *See also id.* at 100 (V.U.'s therapist testifying V.U. exhibited "deregulation" around Mother's missed visits resulting in increase in trauma symptoms). V.U.'s therapist did testify that after one year of therapy, V.U. "is a completely different kid" socially, now participating in school plays, going on sleepovers, making friends, expressing feelings, and becoming involved in sports. *Id.* at 96.

At a March 8, 2023 termination proceeding, V.U. testified that her visits with Mother are "good," that he likes visiting with Mother, and that if he could be reunified with Mother, he would like to live with Mother over Aunt. N.T. Termination Hearing, 3/8/24, at 20. V.U. also testified that she understands what adoption means and that while Aunt provides for her security and she is happy living with Aunt, she would be "sad" if she were not able to see Mother. *Id.* at 23. Finally, V.U. testified that she is worried and upset when Mother

does not show up to visits, *id.* at 25, that she would be happy to stay with Aunt if she could not be reunited with Mother, but that even if B.U. continued to live with Aunt, she would still want to live with Mother if possible. *Id.* at 27. *But see* CCTC Treatment Letter, 10/2/23, at 4 (V.U. began experiencing sadness and sleep issues when visits with Mother resumed).[6]

Finally, B.U. testified that she likes living with Aunt, that her visits with Mother are "good," that she would like to spend more time with Mother, and that she would like to go back with Mother rather than be adopted. N.T. Goal Change/Termination Hearing, 3/8/24, at 28-30. However, B.U. also testified that if it were not possible to be reunited with Mother, she would feel "good" about living with Aunt. *Id.* at 30. CCTC therapists noted that even after 24 trauma-therapy sessions, B.U. has an increase in bedwetting incidents and nightmares before and after her expected visits with Mother. *See* CCTC Treatment Letter, 10/2/23, at 5-6.

At the conclusion of the termination proceedings, counsel for Children asked the court to deny the petitions as to B.U. and V.U., stating that the younger two children "clearly stated that they would like the opportunity to go back with [M]other if the circumstances did, in fact, change [and] that that is a clear sign that these [two] children . . . do not want to be adopted." N.T. Termination Hearing, 3/8/24, at 130, 132. DHS's attorney, on the other hand,

---

[6] Children were represented by both a guardian *ad litem* and separate counsel at the goal change/termination hearings. *See* 23 Pa.C.S.A. § 2313(a); *see also In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (where court finds guardian *ad litem* cannot adequately represent legal interests of child, counsel must be appointed).

argued that it would be in Children's best interest to have the goal changed to adoption and Mother's rights terminated where CUA case manager Vaye testified that Children would not suffer irreparable harm if Mother's rights were terminated and where Children are thriving in their current kinship placement, a pre-adoptive home that has provided Children stability and fulfilled their emotional, developmental, and behavioral needs. *Id.* at 127-28.

On March 8, 2024, the court changed the permanency goal to adoption and involuntarily terminated Mother's rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(2), (5), (8), and (b) of the Adoption Act.[7] Michael J. Graves, Jr., Children's attorney, filed a timely appeal and Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal simultaneously. *See* Pa.R.A.P. 1925(a)(2)(i).

On appeal, Children present the following issues for our consideration:

(1)  Did the trial court fail to follow the correct analysis in evaluating the parent-child bond that requires a determination of whether the bond is necessary and beneficial to the child, and whether severing the bond would cause the child to experience extreme emotional consequences, rather than a mere "adverse" impact[?]

(2)  Was the trial court's determination to terminate Mother's parental rights supported by clear and convincing evidence?

(3)  Was the trial court's determination to terminate Mother's parental rights an abuse of discretion and/or against the weight of the evidence?

Children's Briefs, at 7.

_____

[7] 23 Pa.C.S.A. §§ 2101-2938.

- 8 -

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

On appeal, Children argue that the trial court improperly terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(b) where: (1) a CUA case manager agreed that permanent legal custodianship (PLC) was appropriate; (2) Children understood adoption and clearly did not want to be adopted; (3) Aunt testified that Children had a strong bond with Mother; and (4) a CUA case manager testified that the parent-child bond was necessary and beneficial because Children's behavior continued to improve with CCTC therapy along with Mother's visits. *See* Children's Briefs, at 10.

Recently, in *In the Int. of K.T.*, 296 A.3d 1085 (Pa. 2023), our Supreme Court clarified the standard that courts should employ when examining the parent-child bond under subsection 2511(b), stating:

[N]otwithstanding [the] language [in ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013),] directing "utmost attention" to the parental bond, a fuller review of relevant case law indicates that **bond, plus permanency, stability and all "intangible" factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of "primary" importance in the [s]ection 2511(b) analysis**. Judge Bowes, writing for the panel in [***In re***] ***N.A.M.***, observed that, although the parental bond is a "major aspect" of the [s]ection 2511(b) analysis, "it is nonetheless only one of many factors to be considered by the court," in addition to the intangibles "such as love, comfort, security, and stability." 33 A.3d [95,] 103 [(Pa. Super. 2011)]. Moreover, the court must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. ***See id.*** (courts "must examine the status of the bond to determine whether its termination would destroy existing, necessary and beneficial relationship") (quotation marks omitted). . . . It is only a necessary and beneficial bond, after all, that should be maintained when [s]ection 2511(b) mandates the child's needs and welfare are of "primary" importance. As the statute directs, courts must evaluate whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare. This evaluation involves considering the effect of severing a child's bond with her parent. ***T.S.M.***, 71 A.3d [at] 269. Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm. . . . Moreover, by evaluating the impact of severance to determine if it will impose more than an adverse or detrimental impact, courts correctly refine their focus on the child's development and mental and emotional health rather than considering only the child's "feelings" or "affection" for the parent, which even badly abused and neglected children will retain. ***See T.S.M.***, 71 A.3d at 267, quoting ***K.K.R.-S.***, 958 A.2d at 535 ("[e]ven the most abused of children will often harbor some positive emotion towards the abusive parent") (alteration in original); ***see also K.T.***, 2022 Pa. Super. Unpub. LEXIS 1272, 2022 WL 1793083, at *7 (Murray, J., dissenting), quoting ***K.K.R.-S.***, 958 A.2d at 535.

***Id.*** at 1105-12 (emphasis added; footnotes, some citations, and parentheticals omitted).

While there may be an undeniable bond between Children and Mother, the trial court properly focused its subsection 2511(b) analysis on the totality of the circumstances to conclude that termination was proper.  ***K.T.***, ***supra***. Specifically, the court focused on "intangibles such as love, comfort, security, and stability," took into account the bond that Children have with their kinship family, a pre-adoptive home, and prioritized "the safety and security of Children" over the damage that the parental bond may cause if it is left intact. ***See also In re Adoption of L.C.J.W.***, 311 A.3d 41, 52 (Pa. Super. 2024) (citation omitted); ***T.S.M.***, 71 A.3d at 267 (courts correctly refine their focus on child's development and mental and emotional health rather than considering only child's "feelings" or "affection" for parent, which even badly abused and neglected children will retain); ***In re K.Z.S.***, ***supra*** (court must pay close attention to intangibles including "love, comfort, security, and stability").

Here, the trial judge emphasized the fact that Children are "struggling with uncertainty about the future, fear, anxiety."  N.T. Goal Change/Termination Hearing, 1/18/24, at 117.  Even though Children may have had positive interactions with Mother during their inconsistent visits, the Children's trauma therapists, as well as Aunt, acknowledged that Children exhibited behavioral and emotional setbacks when Mother failed to show for a visit.  Moreover, Children's trauma therapists clearly testified that they

would not recommend Mother participate in caregiver sessions, a prerequisite to reunification, until she had completed a drug and alcohol program and successfully been discharged from mental health treatment. At the time of the termination hearings, Mother was found to have been minimally compliant with her permanency plan and minimally progressed toward alleviating the circumstances that led to Children's original placement—having not obtained suitable housing, not having completed CEU drug and alcohol evaluation/assessment, not having successfully completed a substance abuse program, and not having completed an evaluation and assessment for the Behavioral Health Services Unit.

With regard to PLC, the record reflects that CUA case manager Vaye testified that if Aunt did agree to do PLC, he would "be fine with that [because] that was [his] recommendation." **Id.**, 3/8/24, at 69. However, Vaye testified that Children wanted to live with Aunt if they could not be returned to Mother, **id.** at 44-45, and that while the parties had discussed the possibility of PLC as a permanency goal, because Aunt "said she does not want to do PLC," **id.** at 45, DHS pursued adoption as the better permanency goal. **Id.** at 69. **See** Pennsylvania Dependency Benchbook, 3rd Edition (2019), at Ch.12.4 Permanent Legal Custodianship ("In the hierarchical scheme of permanency options, permanent legal custodianship is less desirable than reunification or adoption, but preferable to permanent relative placement and another planned permanent living arrangement (42 Pa.C.S.[A.] § 6351(f.1)(3)).").

Vaye also testified that while Children have a bond with Mother, that bond is not beneficial to their emotional or physical needs and welfare, that they need stability and security, and that Aunt meets Children's physical and emotional needs. *Id.* at 49-50. Finally, Vaye testified that Children would not suffer irreparable harm if Mother's parental rights were terminated. *Id.* at 50-53.

Because the trial court's factual findings are supported by the record, we conclude that the court did not abuse its discretion in weighing the subsection 2511(b) bond considerations, *T.S.M.*, *supra*, and concluding that involuntarily terminating Mother's parental rights was proper. Thus, we are constrained to affirm. *Int. of M.E.*, 283 A.3d 820, 839 (Pa. Super. 2022).

Decrees affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/27/2024