J-A04020-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.I.Y., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.J.Y., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 500 MDA 2025 |

Appeal from the Decree Entered March 13, 2025
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  10-AD-2025

| | | |
|---|---|---|
| IN INTEREST OF: O.R.Y., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.J.Y., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 501 MDA 2025 |

Appeal from the Decree Entered March 13, 2025
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  11-ad-2025

| | | |
|---|---|---|
| IN THE INTERST OF: E.L.Y., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.J.Y., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 502 MDA 2025 |

Appeal from the Decree Entered March 13, 2025
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  12-AD-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: I.U.Y., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

J-A04020-26

:
:
APPEAL OF: B.J.Y., FATHER       :
:
:
:
:
:    No. 503 MDA 2025

Appeal from the Decree Entered March 13, 2025
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  13-AD-2025

BEFORE:  PANELLA, P.J.E., KING, J., and LANE, J.

MEMORANDUM BY KING, J.:          **FILED MARCH 25, 2026**

Appellant, B.J.Y. ("Father"), appeals from the decrees entered in the Dauphin County Court of Common Pleas, granting the petitions of Appellee, Dauphin County Social Services for Children and Youth ("the Agency"), for involuntary termination of Father's parental rights to his minor children, A.I.Y., O.R.Y., E.L.Y., and I.U.Y. ("Children").  We affirm.

The relevant facts and procedural history of this appeal are as follows. A.I.Y. and O.R.Y. are twins who were born in 2017.  E.L.Y. was born in 2019, and I.U.Y. was born in 2020.  On January 27, 2022, the Agency filed dependency petitions for all four children.  The petitions stemmed from concerns over unsanitary and unsafe housing conditions.  Additionally, the Agency questioned Mother and Father's parenting skills because Children were experiencing developmental delays.  The court conducted a shelter care hearing on January 31, 2022.  Following the hearing, the court placed Children under the temporary care and custody of the Agency.  On February 9, 2022,

- 2 -

the court adjudicated Children dependent, and the Agency placed Children into foster care. Additionally, the court ordered Father to comply with the following objectives:

> Service objectives were for him to cooperate and comply with the Agency, will participate in a reunification service identified, will address mental health and behavioral health needs, will demonstrate an ongoing commitment to his children, will maintain appropriate housing, and then reimburse the county for any support that would be identified through domestics.

(N.T. Termination Hearing, 2/13/25, at 5).

The trial court's opinion described what happened next as follows:

> Following placement in foster care, both parents were granted the right to supervised visits at the Harrisburg YWCA. Throughout July 2022, the YWCA reported ongoing concerns for the safety of the Children during visits and the parents failing to follow the rules or directives from the supervision staff. Specific concerns included the parents' failure to properly diaper the Children or provide prompt bathroom breaks, failure to pay proper attention to the Children including spending time on their phones and/or not paying attention; overfeeding the Children to the point of vomiting, and allowing the Children to climb on furniture with no correction.
>
> On October 25, 2023, a General Protective Services ("GPS") referral was received with allegations concerning one of the twins, A.I.Y., and the third child E.L.Y., both of whom had been diagnosed with a seizure disorder.[1] Father was reported to have inappropriately medicated the Children during visitations. In addition, the referral stated that the

---

[1] At the termination hearing, the Agency's case manager explained: "[A.I.Y. and E.L.Y.] have a seizure disorder which requires maintenance medication, you know, diet, schedule, sleeping schedule. And they all have the GRIN2 genetic mutation—all four, excuse me." (N.T. Termination Hearing, 2/13/25, at 7).

Children would bite each other during visits with Father, leaving visible marks. These allegations were validated by the Agency on November 8, 2023.

On November 27, 2023, the Agency received another GPS referral raising a number of concerns including that Father lacked appropriate housing, failed to properly supervise the Children, and mishandled the Children's medical care. These concerns were later validated by the Agency which noted that the Children would return from Father's home smelling of animal urine and smoke. Father admitted "mixing up" A.I.Y.'s and E.L.Y.'s seizure medications and giving the wrong dose to the wrong child. There were also continued issues with the Children biting each other while visiting Father.

*　　*　　*

In April of 2024, there was an incident where the Children accessed and played with A.I.Y.'s and E.L.Y.'S emergency rescue medication while Father was driving. Thereafter, Father failed to contact the medical providers to obtain a refill of the emergency medication.

On July 14, 2024, the Agency received a GPS referral regarding the youngest child, I.U.Y., who was hospitalized at the time for pneumonia. It was alleged that while Father was at the hospital, he was heard multiple times screaming at the Children through a closed door. His voice was so loud it could be heard down a hallway and made hospital staff uncomfortable and concerned for the Children's safety.

On September 12, 2024, the Agency learned that A.I.Y. had to be taken to the emergency room because he was having trouble breathing. Father was supposed to alternate overnight shifts at the hospital with the foster family to watch A.I.Y. but repeatedly failed to attend his shifts.

Eight (8) permanency review hearings were held during the pendency of these cases: May 12, 2022; August 11, 2022; February 28, 2023; May 4, 2023; September 27, 2023; January 11, 2024; May 8, 2024; and September 16, 2024. … At each permanency review hearing, the Children were found to be dependent and their continuing placement found

"necessary and appropriate." The [c]ourt found Father to be in compliance with the placement plan at all hearings including "moderate compliance" at the first two hearings, "substantial compliance" at five hearings and "full compliance" at one hearing.

At the January 11, 2024 review, the [c]ourt noted that the Children had been in placement for the last 22 months and were no longer within the Adoption and Safe Families Act ("ASFA") timeframe. The [c]ourt, however, granted Father a timeframe exception from the ASFA mandate, which requires the Agency seek termination of parental rights where a child has been in foster care for 15 of the most recent 22 months. Father was granted another timeframe exception at the next permanency review hearing on May 8, 2024. At the hearing on September 16, 2024, however, a timeframe exception was not granted. By that point, the Children had been in placement for 29 months, well outside of the ASFA parameters.

(Trial Court Opinion, filed 8/29/25, at 4-6) (record citations omitted).

On January 16, 2025, the Agency filed petitions for the involuntary termination of Father's parental rights to Children. The court conducted termination hearings on February 13, 2025 and March 13, 2025.[2] At the hearings, the court received testimony from the Agency's case manager, as well as a social worker who assisted the family. Father also testified on his own behalf. Immediately following the March 13, 2025 hearing, the court entered separate decrees terminating Father's parental rights to Children, pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b). Father timely filed

_____

[2] We note that Mother and Father were married, but Father filed for divorce in 2024. The [c]ourt terminated Mother's parental rights to Children on March 13, 2025, and Mother is not a party to the current appeal.

separate notices of appeal and concise statements of errors on Monday, April 14, 2025. On May 12, 2025, this Court consolidated the appeals *sua sponte*.[3]

Father now raises two issues for this Court's review:

> Did the trial court abuse its discretion in terminating parental rights of Father where the Agency failed to meet its burden of proof?

_____

[3] Initially, the court appointed James Petrascu, Esquire, to serve as Children's guardian *ad litem* ("GAL"). At the first termination hearing, Attorney Petrascu indicated that he had not filed a motion to be appointed as Children's legal counsel. (**See** N.T. Termination Hearing, 2/13/25, at 40). At the court's suggestion, Attorney Petrascu made an oral motion for appointment as Children's legal counsel. Father's attorney did not object, and the court granted the motion. Further, the court asked Attorney Petrascu about whether he perceived any conflict of interest by serving as GAL and legal counsel for Children. Attorney Petrascu responded, "I do not at this time." (**Id.** at 41).

On the second day of the hearing, however, Attorney Petrascu announced his opinion that termination of Father's parental rights was **not** in Children's best interests. (**See** N.T. Termination Hearing, 3/13/25, at 75). In light of this announcement, the court determined that it needed to undertake additional fact finding to determine whether Children's best interests aligned with their legal interests. (**See** Trial Court Opinion, filed 5/23/25, at 5). **See also In re Adoption of K.M.G.**, 663 Pa. 53, 240 A.3d 1218 (2020) (explaining that court must appoint attorney to represent child's "legal interest," *i.e.*, child's preferred outcome; child's legal counsel may also serve as GAL, responsible for asserting child's "best interests," so long as child's legal interests do not conflict with attorney's view of child's best interests).

Upon remand, the court conducted a hearing on June 17, 2025. At that time, Attorney Petrascu testified that he did not have a conflict, and his position on Children's best interests aligned with their legal interest, "*i.e.* that the Children's preferred outcome was for no termination of parental rights." (**See** Opinion and Order, filed 6/17/25, at 3). The court accepted this testimony and entered an order finding that Attorney Petrascu did not have a conflict by representing Children's best interests and their legal interests at the termination hearings. Thereafter, Quintina Laudermilch, Esquire, entered her appearance in this Court as substitute GAL and legal counsel for Children.

A. Did the Agency fail to show that Father's repeated or continued incapacity, abuse, neglect or refusal caused the children to be without essential parental care, necessary for their well-being, and those conditions cannot or will not be remedied by Father pursuant to [Section] 2511(a)(2)?

B. Did the Agency fail to show that Father was unsuccessful in remedying the issues before the [termination of parental rights], and that the termination would best serve the welfare of the children pursuant to [Section] 2511(a)(8)?

Did the trial court abuse its discretion by failing to give primary consideration to the developmental, physical, emotional needs, and welfare of the children?

(Father's Brief at 6).

Appellate review in termination of parental rights cases implicates the following principles:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple

hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 667 Pa. 268, 294-95, 255 A.3d 343, 358-59 (2021) (internal citations and quotation marks omitted).

The Agency filed a petition for the involuntary termination of Father's parental rights on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." **In re Z.P.**, 994 A.2d 1108, 1117 (Pa.Super. 2010).[4]

In his first issue, Father contends that the Agency did not meet its evidentiary burden to prove that termination was warranted under either Section 2511(a)(2) or Section 2511(a)(8). Regarding Section 2511(a)(8), Father emphasizes that he cooperated with the Agency, and the Agency's issues with Father were resolved prior to the filing of the termination petitions. Despite his cooperation and improved parenting skills, Father asserts that the court terminated his parental rights based upon the amount of time that Children were in their foster care placements. Father acknowledges the general proposition that a child's life cannot be held in abeyance while their parent is unable to assume parental responsibilities. Nevertheless, Father insists that termination pursuant to Section 2511(a)(8) is unwarranted where Father has complied with the Agency's parenting objectives. Father also notes that he "has participated in the medical needs of the children and developed appropriate supports to assist with his care of the children moving forward." (Father's Brief at 25). Father concludes that the court erroneously found that

---

[4] The court also terminated Father's parental rights under Section 2511(a)(2), but we need only analyze Section 2511(a)(8) for purposes of this appeal.

the Agency presented sufficient evidence to support the termination of his parental rights. We disagree.

"[T]o terminate parental rights under Section 2511(a)(8), the following factors must be demonstrated: (1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa.Super. 2003). "Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa.Super. 2003). Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time. *Id.*

> Notably, this subsection does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of the agency's services. Rather, our inquiry is focused upon whether the at-issue conditions have been remedied such that reunification of parent and child is **imminent** at the time of the hearing. It is axiomatic that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. We cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.

*Matter of S.H.D.N.*, 343 A.3d 737, 747 (Pa.Super. 2025) (internal citations

and quotation marks omitted) (emphasis in original).

Instantly, the trial court correctly recognized that Father had exceeded the twelve-month period for remedying the conditions that led to Children's removal:

> The Children had been in placement for a period considerably longer than twelve months as of the date the TPR Petitions were filed in January 2025. The boys had been, in fact, in placement for **34 months** as of the filing of the TPR Petitions. In addition, as discussed in great detail above, the conditions that led to placement continue to exist, and termination of the parental rights would serve the needs and welfare of the Children, providing them with permanency.
>
> It is not disputed that Father has been very cooperative with the process over the last year, has attended every visit and more recently attended all of his classes and every appointment with the Children, is very amenable to making changes, and has otherwise "done everything he possibly can to comply." Additionally, there is no dispute whatsoever that Father very much loves the Children and is devoted to them.
>
>         \*    \*    \*
>
> Father was given a very lengthy period of almost three years to meet the requirements to qualify for reunification. As such, the Agency presented ample, clear and convincing evidence to establish grounds for termination under Section 2511(a)(8).

(Trial Court Opinion, filed 8/29/25, at 26-27) (emphasis in original).

Earlier in its opinion, in its analysis of the termination provisions of Section 2511(a)(2), the court explained how the conditions leading to Children's removal continued to exist:

> The clear and convincing evidence was that Father has

revealed a repeated and continued incapacity to be a single parent to these Children and that the conditions and causes of his incapacity cannot be remedied. The proposed and agreed upon remedy was for Father to obtain significant and consistent supports, which he has failed to do over the life of this case. The testimony reflected at most a hope by Father that an approved support system will materialize. Father's incapacity has not been remedied to date and this [c]ourt believes Father will be unable to remedy it in the near future.

(**Id.** at 26). Our review of the record supports the court's determinations.

At the termination hearings, the Agency first presented testimony from its case manager, Heather Reinhard. While Ms. Reinhard acknowledged the progress that Father had made in achieving his service objectives, she also noted the obstacles that continue to prevent reunification:

One is the consistency with the housing, the understanding of the developmental needs of the children and the extensive supports and things that are needed there.

The most concerning is being able to be a full-time caregiver for these children. When we had … developed a plan for extended visits over the summer of 2024, it took extensive supports both for [Father] and individuals, as any parent would, we need to have supports because of the needs of these children. But it took an extreme amount of hours by myself, other staff through the Agency and LivingWell[5] to develop the plan.

(N.T. Termination Hearing, 2/13/25, at 14-15).

Ms. Reinhard then provided an example of how Father's purported

_____

[5] LivingWell is a social services group that works "with families on behalf of [the Agency] to help them achieve their [Agency] objectives…." (N.T. Termination Hearing, 2/13/15, at 42).

- 12 -

support system lacked stability.

> The second visit in August was delayed in starting by several days because the day prior to the visit we were asking what the plan was and the support team that [Father] had put in place for his June visitation, all those individuals had backed off so we had to kind of start at square one to get individuals approved for that plan.

(*Id.* at 15). The court responded by asking Ms. Reinhard about two people who were identified as supports at the last hearing. Ms. Reinhard indicated that she had not heard from them since that hearing.[6]

At that point, the questioning shifted towards whether Paternal Grandmother could provide support. Ms. Reinhard testified that Paternal Grandmother, who lives in Florida, was unwilling to participate in an assessment under the Interstate Compact on the Placement of Children ("ICPC")[7], 62 P.S. § 761:

_____

[6] Father's own testimony established why a support system is vital to his ability to parent. Father testified that he currently works two jobs. Father works for "Flagger Force, which is a company that keeps motorists safe in a work zone, stop the traffic, you know, guys out there turning the stop/slow paddles." (N.T. Termination Hearing, 3/13/25, at 8). Father also works at a local supermarket when he does not have shifts with Flagger Force. Due to his work schedule, Father relies on members of his community to provide childcare "before and after school especially." (*Id.* at 24).

[7] Among other things, the ICPC states:

> It is the purpose and policy of the party states to cooperate with each other in the interstate placement of children to the end that … [t]he appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement, thereby

*(Footnote Continued Next Page)*

When the state of Florida had reached out to them for the home study, her understanding was that it was just for somebody to do a walkthrough of the home to approve the home for [Father] and the children to move into her home.

And I explained to her, you know, I thought we had made that very clear not only in this hearing but meetings outside that she was presenting as that formal placement. So she was not at that time willing to have her home, like, to go through the assessment process.

(*Id.* at 16).[8]

Regarding additional services that the Agency could provide, Ms. Reinhard claimed that there was "[n]othing that the Agency is aware of that

_____

promoting full compliance with applicable requirements for the protection of the child.

62 P.S. § 761, Article I.

[8] Father's testimony provided additional context about the complications surrounding Paternal Grandmother's participation as a support. Specifically, Father admitted that he had explored the option of making Paternal Grandmother the primary caregiver for Children. Nevertheless, Paternal Grandmother no longer wished to participate in the ICPC process because "[t]here are some health concerns with my stepfather at the moment." (N.T. Termination Hearing, 3/13/25, at 26). Father added that Paternal Grandmother "would still be willing to act as a support for me … if we—the five of us were down there, with my help she would be able to handle both [her sick husband] and the children with my help." (*Id.* at 27). At the conclusion of Father's testimony, the court expressed skepticism about the feasibility of Paternal Grandmother providing any support for Father moving forward. First, the court observed that a move to Florida would be "putting more on [Father's] plate" because he would have some obligation to assist with the care of his stepfather. (*See id.* at 37). The court also reiterated that Children "would still have to go through the ICPC process because the children are under the jurisdiction of this [c]ourt." (*Id.* at 38). Thus, the court was unwilling to base its termination decision on the mere "hope that something will happen" with Paternal Grandmother's ability to provide support. (*Id.* at 39).

we could offer." (***Id.*** at 20). Under these circumstances, Ms. Reinhard opined that Father would not be able to demonstrate an ability to care for Children independently, and Children deserved some sense of permanency. (***See id.*** at 16-17). Conversely, Ms. Reinhard testified that Children "are doing very well" in their current placements. (***Id.*** at 18). Children's foster parents attend to their medical, educational, and social needs, and Children "are very bonded to their foster parents." (***Id.*** at 19).

The Agency also presented testimony from LivingWell's social worker, Mark Potts. Mr. Potts echoed Ms. Reinhard's opinion that Father was incapable of caring for Children. Initially, Mr. Potts described Children as "four high-energy young boys, and [Father's] a single parent. So there are occasional moments when things get a little bit crazy." (***Id.*** at 43). Mr. Potts also testified that Children's unique temperaments and needs created a situation where reunification was unadvisable:

> My position all along with this case is that, you know, "Superdad" wouldn't be able to take four boys these ages with the learning disabilities they have as a working parent, couldn't do that on their own.
>
> So—and I've been very clear in my position that I don't think [Father] is capable of that. That's why we first focused on [Paternal Grandmother] with the ICPC and subsequently focused on support teams to help him.
>
> And I think generally speaking, that's gone well. Although I have to say recently I'm not sure he's making as strong use of them as he could and should.

(***Id.*** at 44-45).

Later, when questioned by the court, Mr. Potts conceded that Father was not in a position for imminent reunification with Children:

> THE COURT:        Okay.  So how confident are you that returning the children to him right now … would be in their best interest or not be in their best interest?
>
> THE WITNESS:       If we're speaking of today, I would say he has some work to do to prepare for that.

(*Id.* at 60).

Based upon the foregoing, we disagree with Father's assertion that the court terminated his parental rights simply based upon the amount of time that Children have been in placement.[9]  In addition to considering the twelve-month timeframe for a parent to remedy conditions under Section 2511(a)(8), the court properly determined that the conditions that led to Children's removal continued to exist.  *See In re A.R., supra*.  Here, the record confirms that the at-issue conditions were not remedied such that the reunification of

---

[9] As mentioned earlier, Attorney Petrascu opined that Father's parental rights should not be terminated.  Similar to Father's argument on appeal, Attorney Petrascu suggested that the court should not focus on the amount of time that Children had been in placement:

> I don't think maybe we should terminate his rights just because of a couple of months or a number of months that it's gone by to this point without the opportunity for a little more time to see if he can get to the point of reunification with the children….

(N.T. Termination Hearing, 3/13/25, at 75).  Despite this recommendation, we reiterate that "a GAL is not a judicial or quasi-judicial officer, and the orphans' court is not bound by a GAL's recommendation." *In re Adoption of B.A.S.*, 345 A.3d 787, 795 n.2 (Pa.Super. 2025).

Father and Children was imminent at the time of the hearing. *See Matter of S.H.D.N., supra*. Accordingly, the court properly concluded that adequate evidence supported the involuntary termination of Father's parental rights, pursuant to Section 2511(a)(8). *See In re Adoption of C.M., supra*.

In his second issue, Father emphasizes the trial court's finding that a bond exists between Father and Children. Father cites the testimony from the Agency's witnesses that: 1) Children call Father "Dad" during their visits; 2) Children were willing to attend visits; 3) Children cry when the visits end; and 4) termination of Father's parental rights will be difficult for Children to accept. Father insists that he satisfies Children's emotional needs because he "plays with the children, knows their likes and dislikes, and they show affection toward him." (Father's Brief at 29). Father maintains that he satisfies Children's developmental needs because he "is extremely attentive to their learning disabilities," and he "attends [school] meetings and takes notes on what needs improvement." (*Id.*) Regarding Children's medical conditions, Father "attends appointments, properly administers medication and ensures healthy diets … by monitoring the nutritional value of the food they eat." (*Id.*) For these reasons, Father argues that the Agency did not prove that the termination of Father's parental rights will serve Children's best interests. Father concludes that the court abused its discretion by granting the Agency's termination petition. We disagree.

If the court determines that there are grounds to terminate parental

rights under Section 2511(a), the court must "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *In re C.P.*, 901 A.2d 516, 520 (Pa.Super. 2006). "The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." *Id.*

"In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P., supra* at 1121.

Additionally:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care…; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all [their] developmental, physical, and emotional needs. Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

*Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1113 (2023) (internal citations and footnotes omitted).

Instantly, the court conceded that "there is bonding and/or attachment between Father and each child." (Trial Court Opinion, filed 8/29/25, at 29). Despite these bonds, the court found that "the record does not support that Father's bond with the children is necessary and beneficial…." (*Id.* at 30). In support of this conclusion, the court analyzed Children's psychological evaluations. (*See* Hearing Exhibits B3-B6). The evaluations, which were conducted by Dr. Jessica Port, Psy.D., detailed the regression in Children's behavior after their visits with Father:

> O.R.Y.: While Dr. Port described a positive relationship between O.R.Y. and Father during the observation period, his visits outside the clinical setting revealed "anxiety," "regression" and "distress" to O.R.Y. Specifically, prior to visits, O.R.Y. would become physically ill and be unable to eat. In addition, he had soiling accidents and his frustration tolerance became worse. In addition, O.R.Y. preferred being with his foster parent inasmuch as he did not like being separated from her, except during school.
>
> A.I.Y.: Dr. Port described a fairly close relationship, in the clinical setting, between Father and A.I.Y.; however, despite positive interactions, she pointed to A.I.Y.'s behaviors outside of the session, which displayed regression following A.I.Y.'s visits with Father. A.I.Y. was described as often worrying and struggling with adjusting to transitions and that his anxiety is likely expressed through acting out as well as withdrawing from himself. Dr. Port reported that A.I.Y. was reluctant to visit Father and that his frustration level and anxiety increased following visits. A.I.Y. expressed a specific dislike for the 10-day overnight with Father. Dr. Port described his post-visit regressive behaviors as becoming increasingly more challenging. A.I.Y. also expressed worry about having enough food with Father and has come home hungry at times. As with O.R.Y., A.I.Y. does not like being separated from his foster mother. He also tends to worry that his father will be mad at him.

E.L.Y.: While E.L.Y. exhibited a secure attachment with Father, he had secondary features of avoidant attachment and his contact with Father was somewhat muted. He was described as reactive to changes resulting in tantrum-like behaviors that have increased since the initiation of visits with his Father. His struggles with practical communication skills, self-advocacy and modeling influences (including swearing) increased in relation to the frequency of visits with Father.

I.U.Y: Dr. Port reported that I.U.Y. displayed intermittent anxiety that was notable between visits. His foster parent reported that his behaviors became more challenging after visits and that he communicated a lack of desire to visit Father. Foster mother also communicated to Dr. Port that I.U.Y. exhibits generally good behavior in her home but will act out when he returns from Father's home, including throwing tantrums. I.U.Y. does not call Father "dad" but by his first and last name.

(Trial Court Opinion, filed 8/29/25, at 30-31).

Our review of Dr. Port's evaluations confirms the court's summaries. Moreover, the entire record supports the court's finding that "Children's stable foster homes fully provide for the Children's needs and welfare." (Trial Court Opinion, filed 8/29/25, at 31). On this record, the court correctly concluded that terminating Father's parental rights would not destroy an existing, necessary, and beneficial relationship for Children. **See In re Z.P., supra**. To reach this conclusion, the court placed greater weight upon factors such as Children's bond with the foster parents and the foster parents' ability to provide for Children's best interests. We cannot say that the court abused its discretion in how it weighed these factors. **See Interest of K.T., supra**;

***Adoption of C.M., supra***.  Accordingly, we affirm the decrees for involuntary termination of Father's parental rights.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 03/25/2026